James Otto **EARHART**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 70343.

Court of Criminal Appeals of Texas, En Banc.

Sept. 18, 1991.

---

William W. Vance (court appointed), Bryan, for appellant.

Bill Turner, Dist. Atty., and Deena J. McConnell, Asst. Dist. Atty., Bryan, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

BAIRD, Judge.

This is an appeal from a capital murder conviction. Tex.Penal Code Ann. § 19.-03(a)(2). The offense originated in Brazos

County; however, venue was changed to Lee County pursuant to appellant's motion for change of venue. The jury affirmatively answered the two special issues submitted pursuant to Tex.Code Crim.Proc. Ann. art. 37.071 § 2(b) and the court sentenced appellant to death pursuant to art. 37.071 § 2(e). Appeal is automatic to this Court pursuant to art. 37.071 § 2(h). Appellant raises twenty-three points of error, including challenges to the sufficiency of the evidence and the constitutionality of the Texas sentencing scheme. We will affirm.

## I. FACTS

Appellant lodges numerous challenges to the sufficiency of the evidence; therefore, a rendition of the facts is necessary. On May 26, 1987, a Bryan resident noticed a foul odor emanating from a trash heap. The complainant was discovered, buried amidst the pile of refuse, arms tied behind her back with part of an electrical cord. The complainant had disappeared two weeks earlier, on May 12, 1987.

The complainant's younger brother, Jody Kirtland, with whom the complainant typically rode the school bus, left school early on May 12, 1987 for an optometrist's appointment. Ruth Kirtland, the complainant's stepmother, saw the complainant at school during the lunch period and informed the complainant that the younger brother would be leaving school for the appointment. After her stepmother left, the complainant, who was wearing turquoise shorts, a white top and white tennis shoes, told a classmate that this would be her opportunity to "get away."

A school bus driver testified that she dropped the complainant off at the child's home, around 3:40 p.m. on May 12, 1987, as usual. The driver testified that she saw a goldish-tan Chevrolet parked in front of the complainant's house that day, and had never previously seen a vehicle matching that description at the complainant's residence.

Jody Kirtland testified that when he and his stepmother returned home from the optometrist's office he looked for his sister but was unable to locate her. He testified that his sister spoke of being unhappy and of her desire to run away to live with her natural mother. He acknowledged that his stepmother, Ruth Kirtland, hit him and his sister.

The complainant's father, Joseph Kirtland, testified that he told Federal Bureau of Investigation agents that his daughter was very unhappy. He acknowledged that he told the police that the complainant's stepmother yelled at the complainant and struck the complainant. These disciplinary tactics proved to be a subject of disagreement between Joseph and Ruth Ann Kirtland. Joseph Kirtland further acknowledged having a ten thousand dollar life insurance policy on his daughter.

Ruth Ann Kirtland, the complainant's stepmother, testified that she and the complainant's brother returned to their home in the Westwood subdivision of Bryan around 4:00 p.m. on May 12 to discover that the front door to the house was open even though the air conditioner was running. The complainant's books were by the garage. Kirtland discovered that the phone had been moved and a piece of paper containing Joseph Kirtland's telephone pager number was missing. The house key was resting beside the phone. The only item missing from the Kirtland residence was a brown towel, and the complainant was nowhere to be found. Kirtland testified that the complainant had spent the prior weekend with her natural mother, Janice Dell, and that a confrontation ensued when Dell returned the complainant to her home. Several witnesses acknowledged longstanding enmity between Ruth Ann Kirtland and Janice Dell.

Ruth Ann Kirtland further testified that appellant visited the Kirtland home eight days before the complainant disappeared. The record reflects that appellant made a meager living collecting and trading odds and ends, and he stopped at the Kirtland home to inquire about a spray painter which the Kirtlands advertised for sale.

Ruth Ann Kirtland stated that she was asleep the afternoon appellant arrived at their home. The children answered the door and directed appellant to the spray

painter in the garage. When Ruth Ann Kirtland met appellant in the garage, they spoke and appellant made a bid for the spray painter, claiming the painter was for his brother. Ruth Ann Kirtland declined appellant's offer. Subsequent testimony revealed that appellant did not have a brother.

Ruth Ann Kirtland described appellant as obese, filthy and unkempt. She further testified that appellant kept looking the complainant "up and down" as he spoke about the spray painter. Ruth Ann Kirtland testified that appellant drove a Chevrolet Impala, which she described as a "filthy, dirty old car."

Kay Dowling, a resident of Bryan, testified that on the day the complainant disappeared, May 12, 1987, appellant came to her home answering an ad for the sale of kittens. Appellant arrived shortly after 1:00 P.M. and left shortly after 1:20 P.M. While at the house, appellant did not purchase a kitten, but did state that the kitten was for his nine-year-old daughter (the complainant was nine years old). The record reflects that appellant did not, in fact, have any children.

Elizabeth Smith, a resident of the Westwood subdivision of Bryan, testified that appellant visited her home on May 12, 1987, answering an advertisement about the sale of antique furniture. Before arriving, appellant phoned Smith about the furniture. Smith was left with the impression that a woman would be joining appellant to look at the furniture. Appellant, however, arrived at her home alone around 1:30 p.m. and stayed "about 10 to 20 minutes." Appellant looked at the furniture and asked to use Smith's phone. Appellant made a phone call, which Smith believed to be feigned due to the brief time in which it took to place the call. Smith testified that appellant was quite interested in her children, and asked repeated questions about Smith's daughter. Appellant left without purchasing the furniture, and Smith was relieved to see him leave. She testified that she was afraid of appellant and locked her house after he left.

John Rollins, a neighbor who lived across the street from the Kirtlands in the Westwood subdivision of Bryan testified that on May 12, 1987, he went home during his lunch hour. At approximately 1:35 to 1:40 p.m., appellant came to his home, asking if he knew where Ruth Ann Kirtland was. Appellant claimed he wanted to look at the spray painter Kirtland advertised for sale. Rollins testified that appellant drove a cream colored car. Rollins later identified appellant as the man who came to his house from a photo lineup.

Peggy Hesson, also a resident of the Westwood subdivision, testified that on May 12, 1987, appellant arrived at the Hesson home around 2:10 p.m. inquiring if Hesson had an appliance that needed to be hauled away. Hesson recognized appellant from two months earlier, when she had answered an advertisement, placed by appellant, for free hauling of nonworking appliances. On May 12, however, Hesson had no appliance to be hauled. She gave appellant directions to another location, but appellant returned ten minutes later. Her son answered the door the second time and spoke with appellant, who then left. Hesson believed that appellant was intoxicated.

Around 2:45 p.m., appellant reappeared at Elizabeth Smith's residence and stated he wanted to again look at the furniture. Smith believed that appellant paid an inordinate amount of attention to her children, and testified that appellant asked Smith's five-year-old daughter for a bite of her popsicle. Appellant left the Smith residence around 3:10–3:15 p.m. when a neighbor, who was a police officer, arrived home in a marked police car.

Jean Eye and Melanie Terry, two adult female students who lived in the Westwood subdivision, testified that while on a walk on May 12, 1987, between 2:00 and 3:30 p.m., they encountered a man matching appellant's description driving through the subdivision. They testified that the car was moving very slowly, and that the driver appeared unkempt, drunk, and seemed to signal them to get in the car. The women avoided the car and did not see it again.

Glenna Charles Kansky, the Kirtland's next door neighbor, testified that on May 12, 1987 between 3:00 and 4:00 p.m. she looked out her window and saw the complainant speaking in a very animated fashion to someone in a "light colored sedan." The car subsequently pulled into the driveway. Kansky did not see to whom the complainant spoke.

Jacquelyn Gray testified that on either May 11th, 12th, or 15th she was driving down the road where the complainant's body was ultimately found and saw a little girl, dressed in a bright shorts set and white shoes, run out in front of her car. Gray slammed on her brakes, and the girl ran back and took the hand of a very heavy man.

Frank Thurmond testified that "several days before May 22nd," he saw a heavy set man and a "creme," "tan" or "gold" colored car at the location where the complainant's body was discovered.

Dr. Richard Morgan testified that shortly after midnight, May 14, 1987, he saw a brown car parked where the complainant's body was ultimately discovered.

Dr. M.G.F. Gilliland, an Assistant Medical Examiner, postulated that, based upon the autopsy results, the complainant died on May 12, 1987, in the afternoon or evening, as a result of a gun shot wound to the head. A .22 caliber bullet was removed from the complainant.

Dr. Gilliland determined the time of death by counting the generations of maggots found on the complainant's body. On cross-examination, Dr. Gilliland acknowledged that although the weather conditions could affect the numbers and generations of maggots present, she reached her conclusion without the benefit of any information regarding the weather conditions in Bryan for the estimated two weeks the child's body was buried beneath the pile of trash. She subsequently acknowledged that death may have occurred the following day, May 13, 1987.

Appellant's uncle testified that appellant visited him in Houston on May 14, 1987, driving a tan Chevrolet Impala. He acknowledged that appellant had owned a .22 caliber gun for several years. He estimated that appellant drank a case to a case and one half of beer a day.

Sue Crowson, a clerk for Houston's Northline Motor Hotel, testified that appellant checked into the establishment in mid-May, 1987, driving a tan Chevrolet Impala. Although he paid for one week in advance, appellant stayed for only two days. Appellant, a bachelor, obtained a refund for the remaining days by convincing the management that his wife had died in Galveston.

Antonio Cantu, a used car dealer in Houston, testified that on May 20, 1976, a heavy set person using the name George Steven, traded a tan Chevrolet Impala for a 1975 maroon Oldsmobile.

On May 26, 1987, appellant was spotted in a 1975 maroon Oldsmobile in a Walker County camping area. He was arrested pursuant to a warrant around 2:00 a.m., asleep in the car. The authorities recovered a loaded .22 caliber handgun, containing one spent casing, from the vehicle. Appellant's pocket contained a motor vehicle contract bearing the name George Steven, involving the trade in of a 1976 tan Chevrolet Impala. The authorities also seized shirts from the vehicle.

Appellant was transferred to the Walker County Jail, where state and federal authorities interviewed him. Sue Foster, a jailer, testified that appellant made a phone call wherein he stated, "They think I have no remorse for what I did, they don't understand I'm trying to adjust to being in here."

Appellant gave a tape-recorded statement which included the following:

Well I went over to look at a compressor on Monday, and then I came back on Tuesday and she got off the bus there, and I was sitting there. I was fixing to take off and she came up to me and wanted to know if I would give her a ride up to the end of the road there, and so I, I did. She went in the house and, and she came back, and I, I pulled in the driveway and she got in the car and so I took her up and let her off at the end of

Gabbard Road and 2818. And that's all I know about it.

\* \* \* \* \* \*

After I let her out of the car, she crossed Gabbard Road, to that side, and I left her standing there on the corner ... she told me that her, uh, girlfriend was going to pick her up, her girlfriend and her mother, her girlfriend's mother is what she told me.

\* \* \* \* \* \*

All I asked her was where she was going, whether, she said she was going over to her friend's house and, uh, I asked her what time her mother was going to be in before I could look at the compressor and she said later on that evening.

\* \* \* \* \* \*

Well I heard about it [complainant's disappearance] in the paper the next morning and I, I, just, uh, I knew that, you know, they were going to blame me because, I knew they would probably blame me, so I, uh, panicked. I got in the car and left. It wasn't that day, though, it was the next morning, it was Thursday. And, I just went, you know, took some of my clothes. I don't, uh, shouldn't have done it, you know, but I did. I just panicked.

Bryan Police Department officer Jerry Stover testified that he searched appellant's home pursuant to a consent to search and located a box of electrical cords which had one end severed, presumably, from electrical appliances. Officer Stover recovered three .22 caliber bullets from appellant's bedroom. Federal Bureau of Investigation Agent John Riley ran compositional analysis on the bullets recovered from appellant's home, those in his handgun recovered from his vehicle and the bullet which killed the complainant. The bullet recovered from the complainant, two from the revolver and three from the residence were classified as "analytically indistinguishable." Riley determined the remaining bullets to be very close in composition.

Agent Riley testified that bullets which are analytically indistinguishable are "typically found within the same box of ammunition." He later modified that statement to acknowledge that analytically indistinguishable bullets which do not come from the same box most likely would have been manufactured at the same place on or about the same day; that is, in the same batch. He stated that with bullet manufacturing, there could be several thousand bullets with the same elemental composition, or that there could be only "five hundred to one thousand" bullets with the unique composition. He concluded that the likelihood that two .22 caliber bullets came from the same batch, based on *all* the .22 bullets made in one year, is approximately .000025 percent, "give or take a zero."

He subsequently acknowledged, however, that the numbers which he used to reach the .000025 percent statistic failed to take into account that there are different types of .22 caliber bullets made each year—.22, .22 long, and .22 long rifle. Agent Riley ultimately testified that there could be several hundred thousand bullets per batch, but with some variation in the elemental composition within the batch.

FBI Agent Robert W. Sibert testified that due to the state of the bullet recovered from the complainant, he was unable to determine whether the bullet was fired from appellant's gun. He also compared the cords removed from the box in appellant's home, which he described as like a cord severed from a lamp, with the electric cord which bound the complainant. He determined that no cord seized from appellant's home was exactly like the one recovered from the complainant.

FBI Agent John Lawrence Quill testified that he ran hair comparisons between the complainant's hair brush provided by the Kirtlands, the complainant's hair and items seized from appellant. He concluded that the hair on the brush matched the complainant, but that no match existed (neither hair nor fibers) between items originating from appellant and the complainant.

FBI agent Gary Jones testified that none of the complainant's prints were found in the Chevrolet Impala recovered in Houston, nor on any items seized from appellant.

Moreover, he testified the pistol recovered from appellant did not bear any of appellant's finger prints.

FBI Agent Richard R. Reem testified that human blood was located on the front side and end of the barrel of appellant's gun. He was unable to determine the blood type. He stated, however, that the placement of the blood on the gun was consistent with "blow-back blood"—blood which sprayed back from a gun shot.

Agent Reem further testified that spots of human blood were located on the floor panel and passenger's door panel of appellant's Chevrolet, but that he was unable to determine the blood type.

Authorities found a spot of blood on the right sleeve above the cuff of a shirt belonging to appellant.[1] Agent Reem was able to determine that it was human blood, Type O, containing the enzyme PGM $1 + 2 -$. Appellant's blood type was determined to be Type O, containing the enzyme PGM $1 + 2 +$. Reem, therefore, concluded that the blood on the shirt did not originate from appellant, even though the blood on the shirt was Type O. The complainant, according to a Louisiana birth certificate, had Type O blood. Agent Reem testified that forty-five percent of the population has Type O blood.

FBI agent Ronald Rawalt testified for appellant. He stated that he ran extensive soil analyses from the crime scene compared to soil on appellant's shoes, boots, gun and both automobiles. The complainant's shoes contained two types of soil, sandy and silty. Appellant's shoes contained soil and sand which did not match the crime scene. Appellant's boots and shoes found in the trunk of his Oldsmobile Cutlass failed to match the crime scene. Specifically, the boots contained soil inconsistent with the soil at the crime scene, and the shoes did not contain enough soil for a conclusive determination. The gun found in appellant's car contained soil, but Rawalt was unable to obtain a positive comparison between the gun and the soil at the crime scene. Soil found inside the Chevrolet Impala could not be matched to the crime scene, and the soil samples on the tires were inconsistent with the crime scene. Agent Rawalt concluded that he was not stating that the car was not at the crime scene, only that the soil remaining inside the car and that found on the tires did not originate from the crime scene.

Carolyn Gassen testified for the defense that on May 14, 1987, she saw a girl matching the description of the complainant, wearing a white shirt, turquoise shorts, ankle socks and tennis shoes—the clothing in which the complainant was ultimately found—at a Bryan shopping mall. As she had heard of the girl's disappearance, she immediately notified the authorities.

Martha Rodriquez Gill, a Bryan toy store clerk, testified that on May 14, 1987 around 11:00 a.m., she observed a girl matching the complainant's description in the toy store. The girl wore turquoise shorts, a white shirt and white tennis shoes. Gill testified that a woman matching the description of Janice Dell, the complainant's mother, was seen "pulling" the girl around. Gill further testified that later the same day she saw the complainant's picture in the newspaper and contacted the police.

Dr. Fred Fason, a psychiatrist, testified that he interviewed appellant in December of 1987 and diagnosed appellant as one who had feelings of inadequacy and inferiority. During the evaluation, appellant explained that he left the Bryan area after viewing a televised report concerning the girl's disappearance. Specifically, appellant told Dr. Fason, "I left because I didn't know what was going on. I left because I saw on TV that I had been over there, said they're not going to catch me." Dr. Fason testified that appellant was one who would likely flee a distasteful situation. He concluded that a criminal who would bind and kill a child would most likely be a sociopath or psychopath. Appellant, Dr. Fason testified, did not fit that profile.

1. When arrested, appellant was not wearing a shirt. The shirt in question was found, among other shirts, in the Oldsmobile Cutlass.

On the State's rebuttal, Carlos Torres, a business associate of Janice Dell, testified that Dell was with him in Pasadena from lunchtime to around 5:00 p.m. on May 12, 1987. He stated that on May 14, 1987, between 1:30 and 2:00, he again met with Dell in Pasadena.

## II. SUFFICIENCY AT GUILT/INNOCENCE

▉ With respect to the guilt/innocence portion of the trial, appellant alleges that the evidence is insufficient in two respects: 1) to prove that he caused the death of the complainant, and 2) to prove that the complainant died while appellant was in the course of committing and attempting to commit the offense of kidnapping. To determine whether the evidence is sufficient, appellate courts are to look to whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Willis v. State,* 785 S.W.2d 378 (Tex.Cr.App.1989). This standard also applies to cases involving circumstantial evidence. *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (opinion on reh'g). We have repeatedly held that if there is a *reasonable*[2] hypothesis other than the guilt of the accused, then it cannot be said that guilt has been established beyond a reasonable doubt. *Willis,* 785 S.W.2d at 380; *Butler v. State,* 769 S.W.2d 234 (Tex.Cr.App.1989); *Carlsen,* 654 S.W.2d at 450 (McCormick, J., concurring).

▉ The State points out that several witnesses saw appellant in the Westwood subdivision on the day the complainant disappeared, and that appellant admitted giving the complainant a ride that afternoon. The State contends that appellant was repeatedly seen at the entrance of the wooded area where the complainant was ultimately discovered. The record, however, reflects that appellant was never positively identified at the scene, only that a heavy set man was seen there. The State correctly notes that appellant left Bryan two days after the complainant disappeared. While flight is not dispositive of the issue, it can be considered by the fact finder as an indication of guilt. *McWherter v. State,* 607 S.W.2d 531, 535 (Tex.Cr.App.1980).

The State also points to the circumstantial evidence in arguing that the evidence is sufficient to support the jury's verdict. During the time immediately before the complainant disappeared, up until when the complainant's decomposed body was discovered, appellant's statements were fallacious and his behavior was aberrant. He lied to Kay Dowling when he suggested that he had a nine-year-old daughter. He paid inordinate attention to area children. He malingered around Elizabeth Smith's home after he answered Smith's advertisement about the sale of used furniture, failing to leave until he saw a police officer. He lied to the clerk at the motor hotel when he suggested that he had a wife who had died in Galveston. When in Houston, he used a false name when he traded-in his Chevrolet for the Oldsmobile in which he was arrested.

Additionally, spots of human blood were found inside the Chevrolet, although it is undisputed that by the time the Chevrolet was seized it had been in the control of others. Three shirts were found inside the Cutlass, each slightly spotted with human blood. A spot of blood which did not originate from appellant was found on one shirt. The blood type of this spot was consistent with that of the complainant, as well as that of forty-five percent of the population.

Moreover, appellant, who acknowledged being in the presence of the complainant the day she disappeared, was found with a bloodied gun which was capable of firing the type of bullet which killed the complainant. The elemental analysis of the bullets inside appellant's gun matched that of the bullet which killed the complainant.

Appellant, on the other hand, correctly notes that the soil samples from inside appellant's Chevrolet, on the car's tires, on

---

**2.** All emphasis herein supplied by author unless otherwise indicated.

shoes and boots found in appellant's possession and on the pistol in appellant's car failed to match the soil samples from the crime scene. There was no match of the electrical cord binding the complainant and the electrical cords seized from appellant's home. The State was unable to demonstrate that the bullet which killed the complainant was fired from appellant's gun. No hair or fiber samples associated with the complainant were linked to appellant. Spots of blood on various items (including the interior of the Chevrolet, appellant's gun and several of appellant's shirts seized from his Oldsmobile) were not positively linked to the complainant.

Appellant submits that the only physical evidence linking him to the complainant is the elemental analysis of the bullets recovered from the complainant, appellant's home and the pistol in appellant's automobile. Appellant recognizes that his statement admits he was in the company of the complainant sometime before she was killed, but submits that mere presence at some unspecified time in relation to the time of death constitutes insufficient evidence to support a conviction for murder. *King v. State,* 638 S.W.2d 903 (Tex.Cr.App. 1982); *Earnhart v. State,* 575 S.W.2d 551 (Tex.Cr.App.1979).

In *Willis,* 785 S.W.2d 378, we upheld a capital murder conviction where a defendant challenged the sufficiency of the evidence to support the claim that he killed a woman by setting fire to the house in which the woman slept. Willis, who claimed to be asleep inside the house when the fire broke out, gave authorities a story wholly inconsistent with the physical evidence surrounding the arson. Immediately after the fire, Willis was not burned, his hair was not singed, he did not smell of smoke and he suffered no respiratory distress. Two days after the fire, however, Willis claimed to have incurred a shoulder burn during the fire. He demonstrated for the County Sheriff a bad shoulder burn which the Sheriff and other witnesses testified did not exist shortly after the fire. Additionally, the Department of Public Safety crime lab detected unknown volatile components on Willis' pants through gas chromatograph testing. The fire was started by an accelerant which was poured throughout the house and atop the sofa upon which Willis claimed to have been sleeping.

We held that Willis' repeated dubious contentions surrounding the circumstances of the arson, his implausible story that he burned his shoulder during the fire and the volatile components on his pants provided sufficient evidence, when viewed in the light most favorable to the verdict, that he committed the offense. *Willis,* 785 S.W.2d at 382, *citing, Splawn v. State,* 162 Tex. Crim. 197, 283 S.W.2d 66 (App.1955); *Taylor v. State,* 735 S.W.2d 930 (Tex.App.—Dallas 1987).

■ We likewise find the evidence sufficient in the case at bar. Although appellant's presence at the scene of the crime and his flight from the city shortly thereafter are not *alone* sufficient to support a finding of guilt, *King v. State,* 638 S.W.2d 903, 904 (Tex.Cr.App.1982), there is other evidence which inculpates appellant. Spots of human blood were found in the car in which appellant acknowledged giving the complainant a ride. Human blood, in a pattern consistent with "blow-back" blood, was found on appellant's pistol. Human blood matching the complainant's blood type, and inconsistent with appellant's blood, was found on one of appellant's shirts. Moreover, the bullets found in appellant's gun and those found at his home were analytically indistinguishable with the bullet which killed the complainant.

Viewing all the evidence in the light most favorable to the verdict, we hold that there is not an outstanding *reasonable* hypothesis other than the jury's conclusion that appellant caused the complainant's death. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234 (Tex.Cr. App.1989); *Willis,* 785 S.W.2d 378.

Appellant's second point of error contends that the evidence is insufficient to demonstrate the complainant died while appellant was in the course of committing or attempting to commit the offense of kid-

napping. Appellant fails to cite any authority supporting his contention.

A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. Tex.Penal Code Ann. § 20.03(a). "Abduct" means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force. Tex.Penal Code Ann. § 20.01(2).

"Restrain" means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Tex.Penal Code Ann. § 20.01(1). Restraint is without consent if it is accomplished by: (A) force, intimidation, or deception; or (B) any means, including acquiescence of the victim, if he is a child less than fourteen years of age or an incompetent person and the parent, guardian, or person or institution acting in loco parentis has not acquiesced in the movement or confinement. Tex.Penal Code Ann. § 20.01(1).

█ The law imposes no minimal requirement for restraint other than the interference with the person's liberty be substantial. *Rogers v. State*, 687 S.W.2d 337, 342 (Tex.Cr.App.1985). For example, where the defendant stole an automobile containing a young boy, abduction was established. *Sanders v. State*, 605 S.W.2d 612 (Tex.Cr.App.1980). Where a defendant forcibly drives a victim to various parts of a city and keeps the victim isolated from anyone who might be capable of helping the victim, abduction is proven, notwithstanding the claim that the victim was not secreted or held in a place where she was not likely to be found. *Fann v. State*, 696 S.W.2d 575 (Tex.Cr.App.1985).

In *Boyle v. State*, 820 S.W.2d 122 (Tex. Cr.App.1989) *rev'd*, (Tex.Cr.App. delivered May 15, 1991) (reh'g denied this day),[3] we held the evidence was sufficient to prove that Boyle kidnapped a woman (whom he later murdered) even though the evidence demonstrated that the woman voluntarily accompanied Boyle in his truck. This Court noted that simply because the woman voluntarily entered the truck did not preclude the possibility that at sometime during the course of the journey a kidnapping subsequently occurred. The holding noted that within the definition of "abduct," a restraint can be complete without secreting or holding the victim; all the State had to demonstrate was that Boyle interfered substantially with her liberty by at least confining her. *Id.*, 820 S.W.2d at 138.

█ We hold that the circumstantial evidence in the case at bar is sufficient to show that appellant abducted the complainant by substantially interfering with the complainant's liberty. The complainant was unable to consent to the "restraint" because she was under the age of fourteen and the complainant's father and stepmother, with whom the complainant lived, testified that they did not consent to having the nine-year-old complainant taken from their home. Tex.Penal Code Ann. § 20.01(1)(B). The jury could have rationally concluded that at some point during the drive appellant interfered substantially with the complainant's liberty. *Boyle*, supra; *Rogers*, 687 S.W.2d at 342;

█ Moreover, the complainant was ultimately discovered in a secluded wooded area, shot in the head, and with her hands bound behind her back. A passerby noticed a little girl matching the complainant's description and a man matching appellant's description at the entrance to the wooded area in which the complainant was discovered. There is ample evidence that appellant secreted or held the complainant in a place where she was not likely to be found. Accordingly, appellant's first and second points of error are overruled.

## III. SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

Appellant's third point of error alleges *that the evidence is insufficient to support*

---

**3.** The proposition for which the case is cited was not affected by the reversal on original submission, nor was it affected by the opinion on motion for rehearing.

the jury's affirmative answer to the first special issue at punishment; that is, that appellant's conduct was committed deliberately and with the reasonable expectation that the death of the complainant would result. This finding is a prerequisite to the imposition of the death penalty. Tex.Code Crim.Proc.Ann. art. 37.071.[4]

■ In determining whether the jury was justified in finding appellant acted deliberately, we examine whether the jury could have rationally found appellant's state of mind when he committed the offense amounted to a "conscious decision involving a thought process which embraces more than mere will to engage in the conduct." *Webb v. State,* 760 S.W.2d 263, 267 (Tex.Cr.App.1988), *citing* and *quoting, Nichols v. State,* 754 S.W.2d 185, 201 (Tex.Cr.App.1988).

■ The forensic testimony revealed that the complainant, whose arms were bound behind her back, died from a gun shot wound to the back of the head, although the assistant medical examiner could not determine the distance from which the bullet was fired. The complainant's body was found buried amidst a trash heap. We hold these facts sufficient to support the jury's affirmative answer to the first special issue. *Webb,* 760 S.W.2d at 267.

Appellant's fourth point of error complains that the evidence is insufficient to support the jury's finding on the second special issue at punishment concerning future dangerousness. Appellant argues that the evidence was insufficient because the State presented no evidence of a prior criminal record, no psychiatric testimony, no character evidence and no reputation evidence.

■ In making such an assessment, we must view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found beyond a reasonable doubt that appellant would constitute a continuing threat to society. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App.1987). Evidence adduced at both the guilt/innocence and punishment phases of trial can be used by the jury when determining future dangerousness. *Mitchell v. State,* 650 S.W.2d 801, 802 (Tex.Cr.App.1983). Additionally, this Court has repeatedly held that the circumstances of the offense alone are sufficient to sustain an affirmative answer to the second special issue. *Willis,* 785 S.W.2d at 386; *James v. State,* 772 S.W.2d 84, 90 (Tex.Cr.App.1989); *Moreno v. State,* 721 S.W.2d 295, 302 (Tex.Cr.App.1986).

■ In addition to the heinous murder for which appellant was convicted, the record reflects that appellant demonstrated violence toward his family members. At the punishment phase, appellant's sister testified that during a visit to the grave of their deceased sibling, appellant returned from urinating, got in their car and, with a glazed look in his eyes, placed his hands on the sister's neck. She testified that she left the car and ran home. Appellant's female cousin testified that while she and appellant were watching television, appellant put his arm across her throat and his hand on her stomach. She testified that she was left with bruises on her neck. In response to the actions, the cousin locked herself in a bedroom. These unadjudicated offenses constitute a basis for finding appellant to be a continuing threat to society. *Mitchell,* 650 S.W.2d at 812.

■ Finally, appellant's own expert psychiatric witness testified that appellant was not "dealing with a full deck," and concluded that a criminal who would bind and kill a child would most likely be a sociopath or a psychopath.

Given the heinous nature of the offense, appellant's psychological state and his violence toward family members, we find that

---

**4.** Pursuant to Tex.Code Crim.Proc.Ann. art. 37.-071, the trial court submitted the following two special issues at the punishment phase:

 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable ex-

pectation that the death of the deceased or another would result; and

 (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

a rational trier of fact could have reasonably answered the second special issue in the affirmative. *Willis*, 785 S.W.2d at 386; *Mitchell*, 650 S.W.2d at 812. Accordingly, appellant's fourth point of error is overruled.

## IV. TAPE RECORDED STATEMENT

Following arrest, appellant made an oral tape recorded statement which was admitted at trial. *See*, supra at 613. Appellant moved pretrial, and renewed his objection at trial, that the recorded statement was inadmissible because it was involuntarily derived.

■ On appeal, appellant argues that the police failed to comply with the requirements of Tex.Code Crim.Proc.Ann. art. 38.22, Sec. 3(a)(2). Specifically, appellant complains on appeal that the officer failed to inform appellant during the recording of his right to remain silent. We find this issue is not preserved for review because the issue raised on appeal does not comport with the objection lodged with the trial court.

Appellant was read his *Miranda*[5] warnings at the time of his arrest. Additionally, a Walker County Magistrate read appellant his *Miranda* warnings. Sergeant Crenshaw of the Bryan Police Department gave appellant his *Miranda* warnings before questioning at the Walker County jail. Appellant subsequently gave a tape recorded statement.

Appellant's recorded statement contains the following:

[Sergeant Crenshaw]: The time is 11:45 a.m. The reason for this interview, myself and Mr. Williamson, is [sic] investigating the kidnapping of [complainant] in Bryan, Texas. James [appellant], I'm going to read your following rights to you.

You have the right to have a lawyer present to advise you prior or during any questioning. If you are unable to employ a lawyer you have a right to have a lawyer appointed to counsel you prior or during any questioning. You have a right to terminate this interview at any time. And any statement that you do make may and probably will be used in evidence against you at your trial. Do you understand all of the above rights?
[Appellant]: Yes, I do.
[Crenshaw]: Do you wish to waive the above rights and give a statement, James [appellant]?
[Appellant]: Yes, I do.

Section 3(a) of 38.22 states that no oral confession of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless certain requirements are met. One such requirement is found in art. 38.22 Sec. 3(a)(2) which states:

(2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

Article 38.22 Sec. 2(a) sets forth the requisite warnings:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at trial;[6]

Appellant filed a pretrial motion to suppress the statement. In it, he claimed:

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
(5) he has the right to terminate the interview at any time;
Tex.Code Crim.Proc.Ann. art. 38.22 Sec. 2(a).

**5.** See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** The balance of the section consists of the following:
(2) any statement he makes may be used as evidence against him in court;
(3) he has the right to have a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

1) that the officer taking the statement "told [appellant] that any statement that he did make may and probably will be used in evidence against you where the statute specifically says that any statement one makes may be used against him at his trial," and

2) the officer "did not comply with Article 38.22, subsection 3(2) in that there is no evidence that the accused knowingly, intelligently and voluntarily waived his rights as set forth in any warning. It is [appellant]'s contention that the officer did not meet the exact requirements of the statute as set forth and therefore any statement should be suppressed for failure to comply with Article 38.22 of the Code of Criminal Procedure."

Appellant testified at the pretrial motion to suppress and contended that the statement was untrue and involuntarily derived. Appellant acknowledged that on tape he stated that the statement was given voluntarily; however, appellant contended pretrial that the statement was involuntary because he was "in a hypnosis." Appellant admitted that the authorities did not do anything to hypnotize him, but suggested that when people talk to him, he goes "into this out of reality or whatever it is." When asked how often he goes out of reality, appellant replied that he did not know.

At the hearing, appellant's counsel argued only that the statement should be suppressed on voluntariness grounds, stating, "I believe you heard the testimony of Mr. Earhart indicating that he was unduly pressured and coerced into making that statement. And we'd ask the Court to suppress that statement." The trial court overruled the motion to suppress. At trial, appellant's counsel merely renewed his objection at the pretrial hearing by stating, "We would object and renew our earlier objection made on March 21st of 1988 in relation to the admissibility of this tape."

On appeal, appellant complains that Crenshaw's warnings contained on the tape fail to include that appellant had the right to remain silent. However, appellant never voiced this complaint in the trial court; therefore, the issue is not preserved for appeal because it does not comport with the objection raised in the trial court. In *Gauldin v. State*, 683 S.W.2d 411, 413 (Tex.Cr. App.1984), we held that a *Miranda* objection was not preserved for appeal where the objection at trial was based on hearsay and improper predicate. In *Gardner v. State*, 733 S.W.2d 195, 202–03 (Tex.Cr.App. 1987), this Court held that the defendant's argument that a psychiatrist's warnings prior to his interview acted as an inducement was waived where objection at trial only generally complained that the warnings were improper.

Appellant's specific complaint that the warnings contained on the tape fail to include that appellant had the right to remain silent is not preserved for review because the complaint on appeal does not comport with the objection made at trial. *Gardner*, 733 S.W.2d at 202–203; *Gauldin*, 683 S.W.2d at 413. Appellant's fifth point of error is overruled.

## V. DEFINING "REASONABLE DOUBT"

In his sixth and seventh points of error, appellant contends that the trial court erred in denying his requested jury charge defining "reasonable doubt" in both the guilt/innocence and punishment charges. Appellant concedes that this Court has repeatedly held that the term reasonable doubt "does not need amplification or an attempt by the trial court to explain the term." *McGinty v. State*, 723 S.W.2d 719, 720–21 (Tex.Cr.App.1986); *Young v. State*, 648 S.W.2d 2, 3 (Tex.Cr. App.1983). However, we decline appellant's invitation to overrule this holding. Appellant's sixth and seventh points of error are overruled.

## VI. VOIR DIRE

### A. Veniremember Gerhart

Appellant contends that the trial court erred in refusing to permit him to question veniremember Lisa Gerhart on her thoughts about the purposes of punishment. While it is true that counsel is enti-

tled to question veniremembers in order to intelligently exercise peremptory challenges, *Smith v. State*, 703 S.W.2d 641 (Tex.Cr.App.1985), and that questions concerning the punishment philosophy of a juror are proper questions, *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr.App.1985), the record fails to support appellant's claim.

The record reflects the following exchange:

[Counsel]: And you mentioned mercy killing. Do you feel from what you've perceived the law and the range of punishment, that would be the only situation where you would give or consider as little as five years?

[Gerhart]: Well, no. I mean—but I just don't know all the possibilities. I'm not familiar with the law.

[Counsel]: The range of punishment, of course, is geared to a person's own philosophy about what they consider a human life worth a lot of times.

[Prosecutor]: I'm going to object to that statement that the punishment is geared to what a particular juror feels about the worth of a human life.

[Court]: Sustained.

[Counsel]: Because, obviously, they have to listen to the evidence, whatever it might be, and then if they found that a person murdered somebody, they would have found him guilty beyond a reasonable doubt of that offense. Then they've got to place that person's punishment within that scale.

Do you have any difficulty with your responsibility if you were asked to do that, being able to make that type of judgment call that you've indicated to me, how do we do that? A juror would have to do that.

[Gerhart]: Well, I mean, no. It would just be my own opinion, or you know, after hearing the facts. But, I mean, I don't think I would have a problem in—I mean, it's hard to make those kind of decisions, but if that was required of me, I mean I would just do the best I could and make my own personal—

■ The record does not support the contention that the trial court refused to allow appellant to question veniremember Gerhart about her punishment philosophy. The trial court simply prohibited counsel's personal observation that punishment is associated with one's value of a human life. *Contrast, Campbell*, 685 S.W.2d at 25 (trial court impermissibly prohibited counsel from asking veniremember specifically about her punishment philosophy). Appellant's eighth point of error is overruled.

## B. Refusal to Allow Voir Dire Regarding Probation

Appellant's ninth point of error contends that the trial court erred in refusing to allow appellant to question the veniremembers on the subject of probation. Appellant filed a motion for probation, and during a pretrial hearing the court ultimately concluded that appellant was ineligible for probation and specifically prohibited counsel from questioning veniremembers regarding probation.

A defendant is eligible for probation upon sworn motion and proof that he has never before been convicted of a felony in this or any other state. Tex.Code Crim. Proc.Ann. art. 42.12 § 3a(a).

Article 42.12 § 3a(a) provides:

... In no case shall probation be recommended by the jury except when the sworn motion and proof shall show, and the jury shall find in their verdict that the defendant has never before been convicted of a felony in this or any other State....

At the pretrial hearing, the trial court ruled appellant ineligible for probation based upon a prior forgery conviction.

The documents surrounding the forgery conviction reflect that on October 3, 1966, appellant pled guilty to the offense of forgery and the trial court sentenced appellant to three years confinement, "suspen[ded] imposition and execution of the sentence," and placed appellant on three years probation. Appellant contended pretrial, at trial and on appeal that this conviction was not a final conviction for purposes of art. 42.12 § 3a(a), arguing that under the law in effect at the time of the 1966 conviction, the

conviction was not "final" unless the "suspension of imposition and execution of the sentence" had been revoked. The record is devoid of proof of revocation of the 1966 sentence.

In *Bradshaw v. State*, 128 Tex.Crim. 345, 81 S.W.2d 83, 84 (App.1935), this Court addressed how a prior conviction which suspended sentence affected a defendant's probation eligibility, stating:

> When the case was called for trial appellant stated to the court that he had been previously convicted of possessing intoxicating liquor for the purpose of sale, but had been granted a suspended sentence, which had expired and been set aside. His request that he be permitted to file his application for a suspended sentence was denied by the court. Appellant, having been theretofore convicted of a felony, was not entitled to a suspended sentence in the case at bar.

 This Court reaffirmed the holding that a defendant who was under a suspended sentence was ineligible for probation on a subsequent conviction in *Cromeans v. State*, 160 Tex.Crim. 135, 268 S.W.2d 133 (App.1954). We have concluded that even a presidential pardon will not prevent the prior conviction from prohibiting probation eligibility absent an express finding that the defendant was exonerated from the finding of guilt. *See, Watkins v. State*, 572 S.W.2d 339, 343 (Tex.Cr.App.1978).

 Due to the prior forgery conviction, appellant was ineligible for probation in the instant case; therefore, the trial court did not err in refusing to allow appellant to question the veniremembers regarding probation. *Cromeans*, 268 S.W.2d 133. Accordingly, appellant's ninth point of error is overruled.

### C. Retroactive Exercise of Peremptory Challenges

Appellant's tenth and eleventh points of error complain that the trial court did not allow him to exercise peremptory challenges against veniremembers Gerhart and Jantzen. The facts surrounding the voir

dire of these veniremembers are without dispute.

Veniremember Gerhart, accepted by the State and the defense, was the third juror selected. After fifty-three more veniremembers had been questioned, and four more selected, appellant requested to exercise a peremptory challenge to remove Gerhart from the jury. The trial court denied this out-of-time request. Veniremember Jantzen, accepted by the State and the defense, was the fifth juror selected. After thirty-eight more prospective jurors had been questioned, and two more selected, appellant requested to exercise a peremptory to remove Jantzen from the jury. The trial court denied the request.

The gist of appellant's argument is that *if* the trial court had allowed him the retroactive exercise of the peremptories, then the trial court's action would not have constituted error. However, it does not follow that prohibiting out-of-time peremptory challenges does constitute error.

 This Court has held that the trial court has wide discretion over the voir dire process. *Bridge v. State*, 726 S.W.2d 558, 564 (Tex.Cr.App.1986). Article 35.13, Tex. Code Crim.Proc.Ann., provides that once a veniremember in a capital case is qualified, the veniremember "shall be passed for acceptance or challenge first to the state and then to the defendant for either peremptory challenges or challenges for cause." The trial court followed this procedure, and cannot be held in error for failing to provide out-of-time peremptory challenges. Appellant's tenth and eleventh points of error are overruled.

### D. *Powers* Error

In his twelfth through fourteenth points of error, appellant complains of the prosecutor's use of peremptory challenges against three African–American veniremembers. Appellant, a white male,[7] filed a pretrial motion requesting that the court "allow inquiry" each time the State exercised a peremptory challenge on a minority veniremember, "as to the motive for the

---

7. The deceased was also white.

strike." The State agreed to the motion and proffered race-neutral reasons for each strike.

After appellant and the State filed briefs in this cause, the United States Supreme Court held that a criminal defendant has standing to assert the equal protection rights of veniremembers who are improperly prevented from serving as jurors through the discriminatory use of peremptory strikes. *Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

In his twelfth point of error, appellant complains of the State's peremptory strike against veniremember Wilma Lang. The prosecutor offered the following explanation for challenging Lang:

I don't mind explaining. Based on my personal observations of the juror as she came in, based on her—first of all, reading the questionnaire in which—before she had to come to the courtroom and be faced with the lawyers, she was against the death penalty and that was up to God to do. In addition to that, she stated that God's law was higher in her mind rather than the State's law. Granted, she equivocated on that point and did not reach a challenge for cause.

Her feelings about the death penalty, as well as the numerous acquaintances she's had with problems with the legal system so close to home, or her family, and her own son is still on probation ... based on all those things ... it's our feelings that we should exercise a peremptory challenge on Mrs. Lang.

Following the State's explanation, the trial court did not make any specific findings and appellant did not seek further findings from the court.

■ Under *Powers*, —— U.S. ——, 111 S.Ct. 1364, and *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the defendant has the burden of proof to establish a prima facie case of purposeful discrimination, and the burden of persuasion "so that it can be inferred that the State engaged in purposeful racial discrimination." See *Williams v. State*, 804 S.W.2d 95, 101 (Tex.Cr.App.1991). Appellant has failed to meet this burden.

■ The trial court implicitly found that the State offered race-neutral reasons for peremptorily striking veniremember Lang. This Court must accept that finding unless we determine that it is clearly erroneous. *Whitsey v. State*, 796 S.W.2d 707 (Tex.Cr.App.1989) (opinion on reh'g). Under the clearly erroneous standard, we are to accept the trial court's account of the evidence if it is plausible in light of the record viewed in its entirety. *Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Moreover, because a determination of purposeful discrimination usually depends on an assessment of credibility, the content of the explanation and all other relevant surrounding facts and circumstances, the trial court determination is entitled to great deference. *Tennard v. State*, 802 S.W.2d 678 (Tex.Cr.App.1990).

■ Appellant contends that the prosecutor's explanations are essentially a sham because the State asked fewer questions of veniremember Lang than of white veniremembers. While disparate treatment of the veniremembers may support a claim of discriminatory intent, *Lewis v. State*, 775 S.W.2d 13 (Tex.App.—Houston [14th Dist.] 1989, pet. ref'd), the record does not support such a conclusion. The State's voir dire of Lang was relatively short, but the voir dire of African–American veniremember Jackson was quite lengthy. Therefore, the short voir dire of veniremember Lang does not support the proposition that the State treated the African–American veniremembers in a disparate manner or that the prosecutor's explanations for challenging Lang were a pretext for discriminatory intent.

The record reflects that Lang's son was on probation and her daughter's boyfriend had been in the penitentiary. These reasons relate to the individual qualities of the veniremember and not to her race. See *Rasco v. State*, 739 S.W.2d 437 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd). Lastly, although Lang stated that she did not disagree with the law, she indicated

that her spiritual beliefs made it difficult for her to determine another's sentence. Specifically, she stated, "Although the person is guilty, I still believe you should not take their life. It's not up to us to take a life. God is the Judge." Given the answers generated during the short voir dire of veniremember Lang, we cannot conclude that the trial court's finding was clearly erroneous. *Williams*, 804 S.W.2d 95. Appellant's twelfth point of error is overruled.

Appellant's thirteenth point of error contends that the State exercised a peremptory challenge against veniremember Robert Davis on the basis of the veniremember's race. When appellant requested that the State explain the reasoning behind striking Davis, the State volunteered: 1) that based on unspecified background work of the venire panel, the prosecutor was aware of "potential criminal behavior" on the part of Davis; 2) Davis equivocated on whether he could impose a sentence of death; 3) Davis was unemployed; 4) Davis had two children who did not live with him and that Davis had "little contact with them to the point of remembering where they were or who they were with indicated ... a lack of responsibility;" and 5) Davis had an acquaintance who was a murderer. Without making any specific findings, the trial court stated that it "accepted" the prosecutor's explanation.

On appeal, appellant contests the State's explanation, submitting that the brief questioning and lack of meaningful questioning undermines the State's race-neutral response. As we discussed under the previous point of error, the record fails to support the conclusion that the State treated the African–American veniremembers disparately by asking them fewer questions.

Appellant further submits that veniremember Davis' unemployment is irrelevant to the case. The State argues that lack of employment may be indicative of irresponsibility, and thus is a legitimate concern because the State wanted responsible citizens on the jury. See *Johnson v. State*, 740 S.W.2d 868 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd) (explanation that several veniremembers lacked steady employment and had lacked ties to the community held legitimate, race-neutral response).

Additionally, the record reflects that the veniremember equivocated on questions about the death penalty, originally stating he could never vote for the death penalty under any circumstances. Davis also stated that he had several acquaintances who had been to the penitentiary, including his cousin and a friend from school.

Given that Davis was unemployed, that he equivocated on an ability to return a sentence of death, and his association with criminals, appellant fails to demonstrate that the trial court's ruling was clearly erroneous. *Williams*, 804 S.W.2d 95. Accordingly, appellant's thirteenth point of error is overruled.

Appellant's fourteenth point of error complains that the State improperly exercised a peremptory challenge on veniremember Earl Jackson on the basis of Jackson's race. The State offered the following reasons for striking Jackson: 1) when questioned about complying with the range of punishment, Jackson's "statement that he could consider the low end was a much stronger statement than when he said he could consider the high end;" 2) when given the example of an intentional killing, Jackson speculated on other ways in which that crime could be unintentional, leading the State to believe that he would "not accept the obvious;" 3) the State believed that given his responses, Jackson would be extremely hesitant in predicting future dangerousness; and 4) Jackson's strong will would probably place him in a leadership role on the jury, thus compounding the previously mentioned concerns.

On appeal, appellant contends that the trial court's findings are clearly erroneous because the questions posed to Jackson were unrelated to the case, and that the veniremember's strong will should have made him a desirable juror for the State.

The record reflects that the State posed a series of questions regarding an intentional killing, and that Jackson speculated on ways the intentional killing may have been

unintentional. This proclivity to over-speculate, submits the State, is an undesirable characteristic for a juror in a circumstantial evidence case. Jackson also indicated that he would be much more willing to consider the minimum punishment for capital murder than the maximum. The State also notes that appellant's argument that the State should desire a strong-willed juror is without support from the voir dire record in this case.

Because the trial court's finding turns largely on credibility concerns, we must afford it great deference. *Tennard*, 802 S.W.2d 678. We conclude that the trial court's finding was not clearly erroneous.

### E. Veniremember Holcomb

Appellant's fifteenth point of error alleges that the trial court erred in failing to grant his challenge for cause of veniremember Roy Holcomb. Appellant exhausted his peremptory challenges, the court refused to grant appellant's request for additional peremptory challenges, and appellant contends that he was subsequently forced to accept an objectionable juror, veniremember James Foerster. Specifically, appellant complains that Holcomb was subject to a challenge for cause because Holcomb stated that he could not follow the law regarding appellant's Fifth Amendment right not to testify. A review of the record reflects the following:

When asked about the Fifth Amendment, veniremember Holcomb stated:

[Holcomb]: I guess I have to tell you my honest opinion. I really have a hard time with trying to understand why if the crime wasn't committed by that individual, then why that individual wouldn't testify. I just—

[Counsel]: Really what you're telling me is that in a criminal case you think the Defendant ought to get up and say "I didn't do it."

[Holcomb]: I'm saying in a criminal case—I'm saying that in my opinion, if it was me and I didn't do it, I couldn't sit there and not tell the jury I didn't do it.

Later, the veniremember stated:

[Holcomb]: Well, I guess I'd have to say I'm going to turn it over in my mind as to why he didn't get up and say anything.

[Counsel]: So you are—you will consider the fact in deliberating the guilt or innocence, the fact he did not testify even though the Court instructed you not to do so?

[Holcomb]: Yes. I'd ask my—yes, I'd ask myself the question why he didn't testify.

However, when questioned by the State, veniremember Holcomb explained as followed:

[Prosecutor]: Well, my question is would it affect your verdict?

[Holcomb]: No, but I—he asked me whether or not I would ask myself the question, and I said yes, I'd ask myself the question why he didn't testify. But I don't believe it would—him not testifying is not going to sway me one way or the other, if that's what you're asking, but I would ask myself, which is a question as I understood it, would you ask yourself why that defendant didn't testify, and yes, I'd ask myself.

[Prosecutor]: But you wouldn't answer it to the detriment of the defendant? I guess asking the question is one thing, but answering it to the detriment of the defendant is another.

[Holcomb]: I wouldn't answer as to why. I wouldn't answer his question for him, but I'd wonder why. Do you understand that? I'm not going to provide the answer, but I'm obviously going to ask the question. I mean, in my opinion that's just a question that ought to be—that I would ask myself.

\* \* \* \* \* \*

[Holcomb]: No, I wouldn't answer the question, but I—and no it wouldn't influence me, I don't believe, but I'd ask myself the question.

[Prosecutor]: Do you understand that the judge gives you the law that says, basically, you shall not consider nor discuss with your other juror the failure of the defendant to testify?

[Holcomb]: I understand that now.

[Prosecutor]: Can you abide by that law?

[Holcomb]: Yes, sir. But that's not what I understood the question to be, so maybe I just—

[Prosecutor]: He's asking would you wonder about it, and you're saying, yeah, I'd wonder about it. But the question beyond wondering is would you hold it against the defendant, I guess?

[Holcomb]: *No, I wouldn't hold it against the defendant, but I'd wonder about it.* I mean you can ask—in my line of work you ask yourself questions all day long that you wonder about, but you don't necessarily hold it against the person just because you don't have an answer to the question. I mean, that's—

[Prosecutor]: Just state for us so the judge can understand—just state your feelings about that.

[Holcomb]: *I wouldn't hold it against the defendant if he didn't testify. But I'd ask myself the question why. Now, I can ask myself the question and not hold it against him. I mean, it's no presumption of guilt on his part. I understand there's no presumption of guilt on his part because he didn't testify. I can understand that.*

When the trial judge subsequently questioned Holcomb on the matter, the veniremember stated he would follow the law as given in the court's charge.

■ A veniremember is not challengeable for cause unless the juror has demonstrated either a bias against the defendant as a person or a bias against some phase of law upon which the defendant is entitled to rely. *Cordova v. State*, 733 S.W.2d 175 (Tex.Cr.App.1987). See Tex.Code Crim. Proc.Ann. art. 35.16. Where a veniremember states that she can set aside her bias, the trial court's refusal to sustain the defendant's challenge for cause will be reviewed in the light of all of the answer the veniremember gives. *Faulder v. State*, 745 S.W.2d 327, 340 (Tex.Cr.App.1987). Where the court is faced with a vacillating juror, elements such as demeanor and tone of voice, etc., are important factors in conveying the precise message intended; therefore, the trial court's decision is ac-corded great deference. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976).

■ When fully questioned on the issue, veniremember Holcomb indicated that he would not "hold it against" appellant if appellant failed to testify. Given that the trial judge was in the better position to assess the credibility of Holcomb's responses, we conclude that the court did not abuse its discretion in overruling appellant's challenge for cause. *Granviel*, 552 S.W.2d 107. See also *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.1985).

#### F. Veniremember Kubena

Appellant's sixteenth point of error complains that the trial court erred in denying his challenge for cause of veniremember John Kubena. Appellant exhausted his peremptory challenges, the court refused to grant appellant's request for additional peremptory challenges, and appellant contends that he was subsequently forced to accept an objectionable juror, veniremember James Foerster. Appellant asserts that veniremember Kubena was biased against the law, specifically, that Kubena believed the death penalty was appropriate for anyone convicted of capital murder. The record reflects that veniremember Kubena has strong feeling regarding the death penalty. When asked whether he would "always answer" the special issue question in the affirmative based on the fact that a defendant intentionally caused the death of another during a kidnapping, Kubena replied, "I probably would."

However, when questioned by the State, Kubena indicated that he would answer the special issues based on the evidence presented:

[Prosecutor]: In other words, every capital murder doesn't end up in a death penalty?

[Kubena]: I know that.

[Prosecutor]: Some of them are life, some of them are death, based on what the evidence shows you they should be, right?

[Kubena]: Yes, sir.

[Prosecutor]: So my question is this: you understand I have to prove to you the question should be answered "Yes"?

[Kubena]: Yes, sir, somebody has got to prove something.

[Prosecutor]: And if I don't prove it to you it should be answered "Yes", you understand you have to answer it "No"?

[Kubena]: Yes, sir, I understand it.

[Prosecutor]: So could you answer it "No"?

[Kubena]: Yes, sir. Yes, sir.

[Prosecutor]: On either one of those questions?

[Kubena]: I could if that's the way I saw the evidence.

[Prosecutor]: So what you're saying is you've just got to wait until you see what the evidence is?

[Kubena]: Yes, sir.

[Prosecutor]: And after the evidence is shown to you, you will call it that way and you will put it down the way you see the evidence?

[Kubena]: That's right.

[Prosecutor]: So you're not committed one way or the other right now; is that correct?

[Kubena]: No, sir.

[Prosecutor]: You can keep an open mind?

[Kubena]: Sure can.

 The record reflects that the trial court did not err in failing to grant appellant's challenge for cause of veniremember Kubena. Kubena indicated that he would answer the special issues at punishment based on the evidence presented. Where a veniremember will answer the special issues at punishment based on the evidence presented rather than an automatic response to the verdict at guilt/innocence, the veniremember is not subject to a challenge for cause even though the veniremember cannot conceive of a situation where he would answer the special issues in the negative. *Pierce v. State,* 777 S.W.2d 399, 412 (Tex.Cr.App.1989). *See* and *contrast, Gardner v. State,* 730 S.W.2d 675, 684 (Tex.Cr.App.1987) (venire-member unable to objectively follow the law where she believed that finding one

guilty of "intentional" capital murder would invariably suffice to establish affirmative answers to the punishment special issues). As stated previously, the trial judge was in the best position to gauge the veniremember's demeanor, and we must therefore accord his ruling with due deference. Appellant's sixteenth point of error is overruled.

### G. Veniremember Becker

In his seventeenth point of error, appellant alleges that the trial court erred in failing to grant his challenge for cause to prospective juror Cynthia Becker. Appellant exhausted his peremptory challenges, the court refused to grant appellant's request for additional peremptory challenges, and appellant contends that he was subsequently forced to accept an objectionable juror, veniremember James Foerster. Appellant alleges that Becker was biased against the law upon which he was entitled to rely; specifically, Becker indicated that she would affirmatively answer the special issues at punishment after a defendant was found guilty of capital murder.

When examined by the defense, venire-member Becker originally indicated that after finding one guilty of capital murder, she would always answer the first and second special issues in the affirmative. However, when the State explained to her the separate punishment phase and the special issues submitted therein, Becker responded as follows:

[Prosecutor]: And then you're supposed to honestly answer those questions based on what the evidence is, right?

[Becker]: Right.

[Prosecutor]: And do you remember when we talked about it, that you don't automatically give him the death penalty or you don't automatically give him a life sentence? You see, you have to wait and honestly answer it based on what the facts tell you the answer is?

[Becker]: Yes.

[Prosecutor]: Do you feel like you could do that?

[Becker]: Yes.

[Prosecutor]: Are you sure?

[Becker]: Yes, I can.

[Prosecutor]: Okay, You see, because in response to [defense counsel]'s question you said, no, if I found him guilty at the first phase, I would automatically answer these questions "Yes"—with a "yes" answer. Did you mean to say that or did you mean to say that you would base it on what the evidence told you the proper answer would be?

[Becker]: Right, I would listen to the evidence and base it on that.

[Prosecutor]: So you would not automatically answer those questions "Yes"; is that correct?

[Becker]: Right.

[Prosecutor]: Could you tell me what it was about [defense counsel]'s question that was confusing you?

[Becker]: I just—I guess I forgot there was two parts or whatever to the—first, you have to decide guilty or not guilty. I guess that's what confused me.

Veniremember Becker repeatedly stated that she could answer the special issues negatively if she felt the evidence supported that conclusion. This Court has held that a veniremember who is unable to conceive of or envision a situation wherein he or she would answer the first special issues "no" if the defendant had already been found guilty is not *automatically* subject to challenge for cause. *McCoy v. State*, 713 S.W.2d 940, 951 (Tex.Cr.App. 1986). Additionally, where a veniremember will answer the first special issue based on the evidence presented rather than an automatic response to the verdict at guilt/innocence, the veniremember is not subject to a challenge for cause even though the veniremember cannot conceive of a situation wherein he would answer the first special issue in the negative. *Pierce*, 777 S.W.2d at 412.

■ Veniremember Becker's willingness to answer the special issues based on the evidence presented reflects that she was not biased against the law upon which appellant was entitled to rely. *Id.; Harris v. State*, 784 S.W.2d 5, 23–24 (Tex.Cr.App.

1989). Appellant's seventeenth point of error is therefore overruled.

## VII. ARREST WARRANT AND SUBSEQUENT SEARCHES

Appellant's eighteenth point of error submits that the trial court erred in finding that the affidavit underlying the arrest warrant contained sufficient information to constitute probable cause. Appellant filed a pre-trial motion to suppress any evidence recovered as a result of the arrest based on the allegedly deficient affidavit. The trial court withheld ruling on the motion until the court heard the evidence adduced at trial. At trial, appellant again objected to the admissibility of evidence recovered at the time of the arrest based upon the allegedly invalid arrest warrant. The items recovered from the arrest include appellant's pistol, rounds seized from the pistol, the sales contract of the 1976 Chevrolet, and shirts recovered from appellant's automobile.

The affidavit supporting the arrest warrant alleges:

Ruth Ann Kirtland advised affiant that on May 4, 1987, an extremely obese, white man, forty to fifty years of age, whose stomach hung over his belt and crotch of his pants hung down close to his knees and who was extremely dirty and who was driving an old Chevrolet or Ford sedan, burnt orange to tan in color, was at there house inquiring about a paint sprayer in response to an ad in the newspaper. At that time he spoke to her step-daughter, [complainant]. The time was between 3:30 and 4:00 p.m. The obese man entered their home by asking to use the telephone.

Jody Kirtland, brother of [complainant], advised affiant that the man paid a lot of attention to [complainant] and kept watching her.

Ruth Ann Kirtland advised affiant that on May 12, 1987, she returned home at 4:00 p.m. and her grade school daughter, [complainant] who is a nine year old, who usually comes home between 3:30 and 4:00 p.m., was not at home. Her school books and backpack were found on the

front porch and the key that was hidden for [complainant's] use was found inside the home by the telephone. The front door was open. [Complainant] was wearing a white top with turquoise trim and turquoise short, white tennis shoes. A brown towel was missing from the children's bathroom. She further advised that from May 12, 1987 to the present, [complainant] has not been seen.

John Rollins, professor at TTI told affiant that he lives across the street from the Kirtland's and on May 12, 1987, he saw an extremely obese white man in his 40's and who was extremely dirty, come to his house between 1:00 and 2:00 p.m. and asked when the Kirtland's would be home and the obese white man stated "maybe she will be home around 3:00."

Liz Smith told affiant that she lives ... approximately six blocks from the Kirtland's house ... Smith stated that on May 12, 1987, she saw a very large white man, at least 300 lbs. in his 40's come to her house at about 1:00 p.m. in response to an ad about furniture. She was frightened by him and he paid unusual attention to her young daughter. He also ask to use the telephone. She said he was driving a yellow tan Chevrolet. He said he would return at 3:00 p.m.

She said he returned to her house at approximately 2:45 p.m. in the same car and left when her neighbor, a Bryan police officer, came home.

Karen Moody advised affiant that she is a school bus driver and she dropped [complainant] off at her home at approximately 3:35 to 3:40 p.m. on May 12, 1987. At that time she noticed a gold or light brown Chevrolet parked beside the curb with the driver's side of the car on the curb in front of the Kirtland's house.

Charlene Kansky advised affiant that she lives next door to the Kirtland's and on May 12, 1987, between 3:00 and 4:00 p.m., she saw [complainant] talking to the occupant of a standard size American sedan parked beside the curb with the driver's side of the car parked on the curb in front of the Kirtland's house. She then said she saw the vehicle approx-imately a minute later parked in the Kirtland's driveway.

On May 19, 1987, Ida Sprayberry spoke to Major Lee Freeman, Bryan Police Officer, and said that her son, James Earhart, lives with her and his living space is located ... [in] Bryan, TX. She said James Earhart is her son and he is a very large white male and he left town within a couple of days of May 12, 1987 with a friend named Bill from Waco. Major Freeman advised affiant of the contents of her conversation. She also said she received a phone call from him in California.

Special Agent Michael Williamson, FBI, advised that on May 19, 1987, he spoke to Mrs. Gloria R. Quintero of ... Bryan, TX and she said she lives across the street from a very obese white man, about 300 lbs. and she observed him on almost a daily basis since January 2, 1987 and he recently has been seen driving a gold Chevrolet. She said he was last seen by her sometime last week. He further advised that Mrs. Quintero identified the artist's conception [of appellant] (based on Liz Smith's description) as being the man who lived across the street from her. Special Agent Williamson advised that Mrs. Quintero then pointed out the rear of the residence [appellant's home] ... in Bryan, TX.

The artist conception was drawn from information provided by Liz Smith based on her memory of the man who came to her residence on May 12, 1987, as described above. Liz Smith and Professor Rollins have identified the artist's conception as the man that they spoke with on the afternoon of May 12, 1987. This identification was made to affiant.

Ruth Ann Kirtland, stepmother of [complainant], will testify that she positively identified photo number six of a photographic display as being the very large, obese man she spoke to on May 4, 1987 at her residence concerning the spray paint gun.

Photo # 6 of the photographic display being that of James Otto Earhart.

Appellant submits that the information contained within the arrest warrant affidavit is "painfully and woefully lacking" to supply a probable cause determination. An affidavit is only required to contain probable cause, it need not contain sufficient evidence that would convince a jury of the defendant's guilty beyond a reasonable doubt. *Janecka v. State*, 739 S.W.2d 813, 823 (Tex.Cr.App.1987). Appellate courts are to interpret the affidavit in a common sense and realistic manner, and the impartial magistrate who reviewed the affidavit may draw reasonable inferences from the information contained in the affidavit. *Jones v. State*, 568 S.W.2d 847, 855 (Tex.Cr.App.1978). On the other hand, an affidavit which contains a mere conclusory allegation, is insufficient to establish probable cause. *Miller v. State*, 736 S.W.2d 643, 647 (Tex.Cr.App.1987) (officer's statement that "I have good reason to believe and do believe and charge" that suspect committed offense is insufficient); *Green v. State*, 615 S.W.2d 700, 705 (Tex.Cr.App.1981) (officer's statement that he "has good reason to believe and does believe and charge" that suspect committed offense is insufficient). We are to determine whether the affidavit provided probable cause to arrest appellant under the "totality of the circumstances" test. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Whaley v. State*, 686 S.W.2d 950 (Tex.Cr.App.1985).

The affidavit contains facts which establish probable cause. In short, the affidavit states that the child had disappeared; appellant previously encountered the complainant approximately a week before her disappearance, during which time appellant paid "a lot of attention" to the complainant. Several people saw appellant in the Westwood subdivision the day the complainant disappeared, and appellant specifically asked Kirtland neighbor, John Rollins, when the Kirtlands would come home on the date of the disappearance. A car matching the description of appellant's car was seen at the Kirtland home, and the complainant was seen talking to the car's occupant on the afternoon the complainant disappeared. Appellant left town within two days of the girl's disappearance. Additionally, each individual cited within the affidavit is identified by name, and some are also identified by address. The facts contained in the affidavit were told either directly to the affiant, or to other law enforcement personnel. *Wilkerson v. State*, 726 S.W.2d 542 (Tex.Cr.App.1986) (affidavit sufficient although it contained hearsay-within-hearsay where party relating the information to the affiant was a police officer). We hold that the affidavit contained sufficient information with which a detached magistrate could have found probable cause. *Janecka*, 739 S.W.2d at 823; *Jones*, 568 S.W.2d at 855.

Because appellant was arrested pursuant to a lawfully obtained arrest warrant, the trial court did not err in denying appellant's motion to suppress. Therefore, appellant's eighteenth point of error is overruled.

Appellant's nineteenth point of error asserts that the trial court erred in denying his motion to suppress appellant's consent to search appellant's home. Appellant argues that the otherwise valid consent to search was tainted by his "unlawful arrest." The arrest was unlawful, he submits, because the arrest warrant's affidavit was insufficient to establish probable cause. Appellant's argument hinges on the issue raised in his eighteenth point of error. However, as stated previously, the affidavit was sufficient to support probable cause to arrest appellant. Simply put, appellant's consent to search was not tainted by an illegal arrest because the arrest was not illegal. Appellant's nineteenth point of error is overruled.

Similarly, appellant's twenty-first point of error contends that the trial court erred in denying his motion to suppress appellant's tape recorded statement because the statement was tainted by his unlawful arrest. Appellant again asserts that the arrest was illegal because the affidavit included within the arrest warrant lacked sufficient facts to establish probable cause. As noted previously, the affidavit was sufficient, the warrant was valid and the arrest was legal. Appellant's tape recorded

statement was not derived from an illegal arrest.

## VIII. CONSTITUTIONALITY OF THE DEATH PENALTY

Appellant's twentieth point of error submits that the trial court erred in overruling his motion to declare Tex.Code Crim.Proc. Ann. art. 37.071 unconstitutional because the statute fails to provide definitions to key terms included within the punishment charge. Specifically, appellant contends that the statute is deficient for its failure to define "reasonable expectation that death will result, criminal acts of violence and continuing threat to society." [8]

■ This Court has repeatedly held that the terms "deliberately," "probability," "criminal acts of violence" and "continuing threat to society," all terms contained in Tex.Code Crim.Proc.Ann. art. 37.-071, require no special definitions. *Fearance v. State*, 771 S.W.2d 486, 513 (Tex.Cr. App.1988); *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App.1977). Appellant's twentieth point of error is therefore overruled.

■ Appellant's twenty-second and twenty-third points of error assert that the trial court erred in overruling appellant's objection to the punishment charge and in refusing to submit appellant's requested charge at punishment. Appellant contends that the charge unconstitutionally restricted the jury's consideration of mitigating evidence pursuant to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In *Penry*, 492 U.S. 302, 109 S.Ct. 2934, the United States Supreme Court held that Tex.Code Crim.Proc.Ann. art. 37.071, as applied to Penry's case, operated in an unconstitutional manner by failing to provide the jury with a mechanism to give effect to Penry's mitigating evidence of mental retardation and severe childhood abuse.

Appellant's mitigating evidence, as set forth in his brief, is as follows:

1) Appellant's uncle testified that appellant's father "treated [appellant] badly" when appellant was a child;

2) Appellant often drank a case to a case and a half a day;

3) A psychiatrist testified that appellant suffered from various psychological and psychiatric problems and was "not dealing with a full deck;"

4) Appellant's mother testified that appellant provided support for her. Appellant often picked food from supermarket dumpsters and would use that food to feed his mother and older neighbors in the neighborhood.

We conclude that appellant's mitigating evidence can be given its fullest mitigating effect through the special punishment issues. The record reflects only vague testimony that appellant was "treated badly" as a child. This evidence does not fall within the ambit of *Penry*, wherein it was shown that Penry's mother frequently beat Penry over the head when he was a child, Penry's brain damage may have been caused by beatings and multiple injuries to the head, and Penry was repeatedly locked in a room without access to a toilet for long periods of time. *Id.* See also, *Lackey v. State*, 816 S.W.2d 392, 399 (Tex.Cr.App.1991) (opinion on reh'g) (limited intellectual capacity, problematic relationship with father and physical abuse by father held to be given its fullest mitigating effect through the special issues).[9]

The brief psychiatric testimony that appellant did not "deal with a full deck" also fails to rise to the level of mitigating evidence addressed in *Penry*, wherein the record demonstrated that Penry had a men-

---

**8.** Appellant's brief is devoid of any caselaw to support his argument and he offers no reasoning to support his conclusion that "the jury is not provided with a mechanism for guided decision making." Accordingly, this point of error is insufficiently briefed for appellate review. See Tex.R.App.Pro. 74(f). In the interest of justice, we will address the contention raised herein.

**9.** The author of this opinion adheres to his dissenting opinion in *Lackey*, wherein it is stated that evidence of limited intellectual capacity and child abuse can fall beyond the scope of the special issues. *Lackey*, 816 S.W.2d at 405–407 (Tex.Cr.App.1991) (opinion on reh'g) (Baird, J., dissenting).

tal age of a six and one-half year old, Penry was mentally retarded, and Penry was diagnosed as having organic brain damage. *Penry,* 492 U.S. 302, 109 S.Ct. 2934.

We likewise conclude that evidence of appellant's drinking can be given its fullest mitigating effect within the special issues. The record does not reflect expert or medical testimony that appellant was an alcoholic. While alcoholism might be inferred from the brief lay testimony that appellant often drank over a case a beer a day, the record does not demonstrate how many weeks, months or years appellant drank excessively. Moreover, there is no evidence how appellant's drinking, if it amounted to alcoholism, might have affected his moral culpability. *See and contrast, Ex parte Rogers,* 819 S.W.2d 533 (Tex.Cr. App.1991) (Clinton, J., joined by Baird and Maloney, JJ., dissenting) (psychiatric evidence of how PCP may affect a habitual user).

With respect to appellant's evidence of kindness toward others, this Court has held that this type of mitigating evidence is afforded its fullest effect within the scope of the special issues. *Black v. State,* 816 S.W.2d 350 (Tex.Cr.App.1991).[10]

Because art. 37.071 did not operate in an unconstitutional manner as applied to appellant's case, we hold that appellant's twenty-second and twenty-third points of errors are overruled.

The judgment of the trial court is affirmed.

CLINTON and MALONEY, JJ., dissent.

---

**10.** The author of this opinion adheres to his dissenting opinion in *Black v. State,* that evidence of positive character traits can fall be-

yond the scope of the special issues. *Black,* 816 S.W.2d 350, 375 (Tex.Cr.App.1991) (Baird, J., dissenting).