In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00839-CR

NO. 01-08-00840-CR






BRUCE ERWIN LEADON, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 178th District Court

Harris County, Texas

Trial Court Cause Nos. 1134275 and 1134276






O P I N I O N


 Appellant, Bruce Erwin Leadon, was charged twice with aggravated robbery
with a deadly weapon for robbing the same restaurant on two separate occasions. See
Tex. Penal Code Ann. §§ 29.02, 29.03 (Vernon 2003). The offenses were tried
together, and a jury found appellant guilty of both offenses and assessed punishment
for each offense at sixty years' imprisonment to run concurrently and a $5,000 fine. 
In three issues, appellant contends that: (1) the evidence supporting his convictions
is legally and factually insufficient; (2) the trial court erred in denying his Batson
challenge to the State's peremptory strikes; and (3) the trial court erred in refusing to
allow his mother to testify during the punishment phase that appellant is mentally
challenged. We affirm.

Background

 Appellant was convicted of robbing the same Waffle House restaurant twice,
once on May 12, 2007 and again on June 20, 2007, with his half-brother, Terence
Briscoe. Both robberies took place during the early morning hours. The Waffle
House was located within walking distance and less than a mile away from the
apartment that appellant and Briscoe shared with their parents. 

 In the early hours of the morning on May 12, 2007, appellant and Briscoe
entered the Waffle House on Almeda-Genoa Road and chose a corner booth. Karon
Blackmon, a waitress at the restaurant, approached the two men to provide menus and
silverware and to take their order. After serving appellant and Briscoe, Blackmon left
their ticket at the table for payment. Blackmon testified that the restaurant was
"[e]xtremely" busy and she was not able to observe everything that the men were
doing because she had other customers. However, she noticed that appellant was
doodling on his napkin. Appellant and Briscoe approached the cash register, as if to
pay for their meal, but instead, Briscoe placed a gun to Blackmon's forehead. 
Blackmon testified she "basically blacked out" and only remembers backing away
from the register with her hands up. Blackmon feared for her life. Briscoe followed
her with the gun continuing to point it at her head, and once she backed away from
the register, appellant came around the counter, "opened the register, got the money,
put it in a backpack and they ran out." 

 When the cook at the restaurant realized what was happening, she ran to the
motel next door to call the police. Officer Wyatt of the Houston Police Department
("HPD") was one of the first officers on scene. Officer Wyatt testified that she
attempted to lift fingerprints off of the ketchup and syrup bottles on the table at which
appellant and Briscoe sat. Wyatt also tagged the pair's receipt and the napkin on
which appellant was doodling for further examination by the HPD crime lab. At trial,
Officer Wyatt read several phrases from the napkin, including, "Money, money,
money is my intuition. Money over bitches. Such an easy decision." Wyatt testified
that "names of gangs" were also written on the napkin.

 HPD Officers Rowe and Werner testified that the HPD crime lab found one
usable fingerprint on the receipt, but it did not match appellant, Briscoe, or their
waitress, Blackmon. Officer Werner compared the print with all of the prints in the
Automated Fingerprint Identification System (containing prints of all individuals
arrested by HPD and all HPD officers) but did not find a match. However, testimony
was given that another waitress and the cook touched the receipt and, thus, either
could have left the print.

 Blackmon testified that she provided police with a description of the two men.
She did not expect to ever see the men again, but said she could never forget the faces
of the men who committed the robbery. Scared from the ordeal, Blackmon took some
time off work, but eventually returned. 

 Blackmon was working the late night shift again on June 20, 2007. June 20
was "a slow night," and there was only one customer, an older man. Only two
employees were working that shift: Blackmon waited tables, while Nina Christian
cooked the customers' orders. Christian was a new employee, and June 20 was her
second night on the job. At around 4:00 a.m., Blackmon took a cigarette break. 
While Blackmon was on her break, appellant came into the restaurant, this time alone
and speaking on a cell phone. After telling Christian he wanted to place a to-go
order, he proceeded to the restroom. Christian alerted Blackmon that a customer
wanted to place an order. When Blackmon returned from her break, she went to the
register where appellant was standing. Blackmon testified that she "couldn't stop
staring at [appellant]" because she was certain she recognized him from somewhere
but could not immediately place his face. Appellant avoided making eye contact with
Blackmon and kept his head down. Then, Blackmon looked up, and through the front
window, saw Briscoe approaching the restaurant carrying the "same old backpack"
used in the first robbery. Upon seeing Briscoe, Blackmon testified that "it click[ed]." 
After Blackmon realized that these men were the same men that robbed the store in
May, she ran to the back exit. As Briscoe entered the restaurant, appellant left
without picking up his order. When Blackmon reached the back door and looked
back toward the cash register, Briscoe "was pointing the gun at [Christian.]" 
Blackmon ran out the back door to the motel next door and called 911. While
pointing the gun at Christian, Briscoe moved towards the cash register, opened it, and
filled his backpack with money. Christian testified that she was afraid she might be
killed.

 When the police arrived, Blackmon told the officers that the robbers were the
same men that robbed the store in May. Sergeant Nieto of the HPD Robbery Division
began investigating the two robberies. Sergeant Nieto created photo arrays
containing the pictures of appellant and Briscoe. Both Christian and Blackmon
positively identified the two men from the photo arrays. Christian and Blackmon also
identified appellant at trial. 

 Appellant offered four alibi witnesses, all of whom testified that they distinctly
remember appellant being at home on both May 12, 2007 and June 20, 2007. 
Appellant and Briscoe shared a room at their mother and stepfather's apartment, and
had a strict curfew of 11 p.m. Their stepfather testified that, because appellant and
Briscoe were unemployed, he set strict rules that the men be home by 11 p.m., wake
by 6 a.m., and spend the day looking for work. Both appellant's mother and
stepfather testified that, on the two nights in question, appellant was at home when 
they went to sleep that night and when they got up in the morning.

 The apartment had a front door and sliding patio door. At the time of the
robberies, appellant's stepfather testified that, he had been sleeping on the couch so
he could watch the front door to make sure that someone did not "break in." He
testified that there had been a problem at the apartment complex with people "kick-dooring" the apartment doors to gain access. Because he was sleeping near the front
door, appellant's stepfather testified that appellant and Briscoe could not have left the
apartment during the night on the dates in question.

 The patio door led to a second-floor balcony. The patio door was located
closest to the room that appellant and Briscoe shared. However, their stepfather
testified that he knew the men did not use the patio door to leave the apartment on the
nights of the robberies because the railing on the balcony was loose and too weak to
support the men's weight. Appellant's mother testified that they left the patio railing
loose as a safety precaution so that people could not gain access to the second story
patio. However, appellant's mother testified that it was possible to get up to the patio
by climbing up to the next-door neighbors' patio and going around the neighbors'
apartment. 

I. Legal and Factual Sufficiency

 In his first issue, appellant contends the evidence supporting his convictions
is legally and factually insufficient. Specifically, appellant argues that the evidence
is insufficient to establish his identity as the perpetrator of the offense. Additionally,
appellant contends that the evidence is insufficient to establish that he acted as a party
to the June 20, 2007 aggravated robbery.

A. Aggravated Robbery

 In order to convict appellant of aggravated robbery, the State was required to
prove beyond a reasonable doubt that appellant, acting as either a principal or a party,
while in the course of committing theft, intentionally or knowingly threatened or
placed a person in fear of imminent bodily injury or death while using or exhibiting
a deadly weapon. See Tex. Penal Code Ann. §§ 29.02, 29.03 (Vernon 2003). A
firearm is considered a deadly weapon. Tex. Penal Code Ann. § 1.07(a)(17)(A)
(Vernon Supp. 2008). 

B. Law of Parties

 A person is criminally responsible as a party to an offense if the offense is
committed by their own conduct, by the conduct of another for which she is
criminally responsible, or by both. Tex. Penal Code Ann. § 7.02(a) (Vernon 2003). 
A conviction under the law of parties is appropriate if there is evidence that the
defendant was physically present and encouraged the commission of the crime by
words or other agreement. Ransom v. State, 920 S.W.2d 288, 302 (Tex. Crim. App.
1994) (op. on reh'g). 

 Since an agreement between parties to act together in common design can
seldom be proven by words, the State often must rely on the actions of the parties,
shown by direct or circumstantial evidence, to establish an understanding or a
common design to commit the offense. Miller v. State, 83 S.W.3d 308, 314 (Tex.
App.--Austin 2002, pet. ref'd). The agreement, if any, must be made before or
contemporaneous with the criminal event, but in determining whether the accused
participated as a party, the court may look to events occurring before, during and after
the commission of the offense, and may rely on actions of the defendant which show
an understanding and common design to do the prohibited act. Beier v. State, 687
S.W.2d 2, 3-4 (Tex. Crim. App. 1985); Miller, 83 S.W.3d at 314. Circumstantial
evidence may suffice to show that one is a party to an offense. Wygal v. State, 555
S.W.2d 465, 469 (Tex. Crim. App. 1977); Miller, 83 S.W.3d at 314.

 While mere presence at the scene is not enough to sustain a conviction, that
fact may be considered in determining whether an appellant was a party. Valdez v.
State, 623 S.W.2d 317, 321 (Tex. Crim. App. 1979) (op. on reh'g); Miller, 83 S.W.3d
at 314. If the evidence, however, shows the mere presence of an accused at the scene
of an offense, without more, it is insufficient to sustain a conviction as a party to the
offense. Valdez, 623 S.W.2d at 321; Scott v. State, 946 S.W.2d 166, 168 (Tex.
App.--Austin 1997, pet. ref'd).

C. Legal Sufficiency

 1. Standard of Review

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict and determining whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
Cruz v. State, 238 S.W.3d 381, 386 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd)
(citing King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)). The trier of fact
is the sole judge of the weight and credibility of the evidence. Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the evidence
and substitute our judgment for that of the fact-finder. Dewberry v. State, 4 S.W.3d
735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the
evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App.
2000).

 2. Analysis

 Appellant contends that the evidence is legally insufficient to support his
convictions. Specifically, appellant argues the evidence is insufficient to establish
his identity in the May robbery and to show that appellant was a party to the June
robbery.

 Blackmon testified that, on May 12, 2007, appellant and Briscoe entered the
Waffle House together and ate a meal, prior to robbing the restaurant. The two men
approached the register, as if they were going to pay for their meal, but instead,
Briscoe pointed a gun at Blackmon's forehead. Blackmon testified that Briscoe was
about two feet away from her when he pointed the gun at her head. Blackmon was
in fear for her life and backed away from the register with her hands up. Appellant
opened the cash register and took out all of the money, while Briscoe continued
pointing the gun at Blackmon. Blackmon positively identified appellant in a photo
line-up and in court as the man who robbed the restaurant on May 12, 2007.

 Christian testified that, on June 20, 2009 around 4:00 a.m., appellant entered
the restaurant, while talking on a cell phone, placed a to-go order, and went into the
restroom for about five minutes. Appellant left without picking up the order. As
appellant was exiting, Briscoe entered with his gun drawn, pointed the gun at
Christian, and emptied the money in the register into his backpack. Christian testified
that she was afraid she would be killed. Blackmon and Christian both identified
appellant as the man who was in the restaurant immediately before Briscoe threatened
Christian with the gun and took the money from the register. 

 Although appellant points to the alibi evidence he presented at trial, the record
shows that witnesses positively identified him as one of the perpetrators. Blackmon
positively identified appellant in a photo line-up and in court as the man who robbed
the restaurant in May. Both Christian and Blackmon positively identified appellant
in a photo line-up and in court as the man who entered the restaurant just before
Briscoe on the night of the June robbery. The identification of appellant by the eye-witnesses is sufficient to support appellant's convictions. See Davis v. State, 177
S.W.3d 355, 359 (Tex. App.--Houston [1st Dist.] 2005, no pet.) ("It is well
established that a conviction may be based on the testimony of a single eyewitness.");
Harmon v. State, 167 S.W.3d 610, 614 (Tex. App.--Houston [14th Dist.] 2005, pet.
ref'd) (holding witness's testimony identifying appellant is sufficient, standing alone,
to support conviction); Aguilar v. State, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971).

 As to whether appellant was a party to the June 20 robbery, given appellant's
active role in the earlier robbery with Briscoe six weeks earlier under similar
circumstances -- i.e., they appeared as customers immediately before the offense,
appellant was present at the Waffle House just seconds before Briscoe entered with
a gun, appellant's placing a to-go order was a ruse because appellant did not pick up
the order when he left the restaurant immediately before the offense, and the close
relationship between appellant and Briscoe, a juror could have reasonably found that
appellant encouraged, aided, or attempted to aid Briscoe by, for instance, informing
him via cell phone of the conditions inside the restaurant, creating a distraction just
prior to the robbery, and serving as a lookout while Briscoe pointed the gun at
Christian and emptied the cash register. There is evidence in the record indicating
that appellant was acting with Briscoe under a common scheme. See Wygal, 555
S.W.2d at 469 (holding that circumstantial evidence may suffice to show that one is
a party to an offense); see also Miller, 83 S.W.3d at 314. Viewing the evidence in a
light most favorable to the jury's verdict, the record shows that appellant acted as a
party to the June 20, 2007 aggravated robbery. 

 As to both offenses, a rational jury could conclude from this evidence that
appellant, acting as a party, while in the course of committing theft, placed Waffle
House employees in fear of imminent bodily injury or death while using or exhibiting
a deadly weapon, namely, a firearm. Tex. Penal Code Ann. §§ 29.02 & 29.03. 
Therefore, the evidence is legally sufficient to support the jury's verdicts of guilt.

D. Factual Sufficiency

 1. Standard of Review

 When conducting a factual sufficiency review, we view all of the evidence in
a neutral light. Brown v. State, 212 S.W.3d 851, 859 (Tex. App.--Houston [1st Dist.]
2006, pet. ref'd) (citing Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999)). 
We will set the verdict aside only if (1) the evidence is so weak that the verdict is
clearly wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Brown, 212 S.W.3d at 859 (citing Johnson v. State,
23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). Under the first prong of Johnson, we
cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply
because, on the quantum of evidence admitted, we would have voted to acquit had we
been on the jury. Brown, 212 S.W. 3d at 859 (citing Watson v. State, 204 S.W.3d
404, 417 (Tex. Crim. App. 2006)). Under the second prong of Johnson, we cannot
declare that a conflict in the evidence justifies a new trial simply because we disagree
with the jury's resolution of that conflict. Id. Before finding that evidence is
factually insufficient to support a verdict under the second prong of Johnson, we must
be able to say, with some objective basis in the record, that the great weight and
preponderance of the evidence contradicts the jury's verdict. Id. In conducting a
factual sufficiency review, we must also discuss the evidence that, according to the
appellant, most undermines the jury's verdict. Brown, 212 S.W.3d at 859 (citing Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003)).

 We may not re-weigh the evidence and substitute our judgment for that of the
fact-finder. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The
fact-finder alone determines what weight to place on contradictory testimonial
evidence because that determination depends on the fact-finder's evaluation of
credibility and demeanor. Cain v. State, 958 S.W.2d 404, 408-09 (Tex. Crim. App.
1997). As the determiner of the credibility of the witnesses, the fact-finder may
choose to believe all, some, or none of the testimony presented. Id. at 407 n. 5. 

 2. Analysis

 Appellant contends that the evidence supporting his convictions is factually
insufficient. Specifically, appellant argues that Blackmon was an unreliable witness
because she admitted to being "in shock" during the first robbery, was unduly
influenced by Nieto when she examined the photo arrays, and is a "convicted drug
felon." Additionally, appellant argues that there was "no physical evidence" linking
him to either robbery and that he has strong alibi testimony regarding both offenses.

 Because the jury is the exclusive judge of the credibility of the witnesses and
of the weight to be given their testimony, we cannot, on appeal, weigh the credibility
of the witnesses. See Barnes v. State, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994).
Here, the jury chose to believe the testimony of Blackmon and Christian and
disbelieve that of appellant's alibi witnesses, and we cannot disturb the jury's
determination. See Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)
(holding jury is sole judge of witness credibility and may believe some witnesses and
refuse to believe others).

 Appellant argues that Blackmon admitted her identification of appellant was
tainted by police. This is a misstatement of the record. In his brief, appellant
contends that a police officer told Blackmon that the photo of the suspect was in the
photo array. To the contrary, Sergeant Nieto admonished Blackmon that the photo
array may or may not have contained a photograph of the suspect. Blackmon's
testimony shows that she understood the admonishment, as she testified that she
would not have circled one of the pictures if she did not see one of the individuals
who committed the offense.

 Also, appellant states in his brief that police officers told Blackmon how to
spell "positive," instructing her to write that on the photo she chose. Again, appellant
misstates the record. First, it is important to note that the testimony referred to
marking of the photo array containing Briscoe's picture, not appellant's picture. (1) 
Moreover, Blackmon never testified that anyone told her how to spell "positive." 
Rather, she testified that she made a spelling mistake, crossed it out, wrote "positive"
correctly, and then the officer asked her to initial the change to indicate that she made
the change.

 In his brief, appellant argues that "the prints clear him" from being the
perpetrator of the May 2007 offense. This assertion is without merit. Testimony was
given that another waitress and the cook touched the receipt on which the print was
found. The fingerprints of those individuals were not taken and compared to the print
left on the receipt. Because the evidence shows that other persons touched the
receipt, it cannot be said that only the true perpetrator could have left the print in
question.

 Appellant states in his brief that "Christian said that Appellant was the man
simply on the cell phone, not involved in the robbery." (Emphasis added.) This is
also a misstatement of the record. When questioned about the photo array containing
the picture, Christian testified "[t]hat's the first gentleman with the cell phone who
is sitting in the courtroom." She never testified that appellant was not involved in the
robbery. Appellant similarly misstates the record when he argues, "There was no
testimony that Appellant was at all involved as a party to that 2nd robbery." Rather,
Blackmon testified that the "same people" robbed the store again. The second
robbery occurred around 4 a.m. on a slow night, when there was only one customer. 
Christian testified that appellant entered the restaurant around 4:00 a.m. and told her
that he wanted to place a to-go order. Appellant was talking on a cell phone and went
into the bathroom for about five minutes. Appellant left the restaurant without
receiving the order he placed. As appellant exited the restaurant, Briscoe entered
brandishing a weapon. Additionally, the jury could have properly considered the
joint participation of Briscoe and appellant in the May robbery to decide that they had
a similar plan to act together in committing the June offense. The circumstances of
the June offense tend to show that appellant was not merely present but, rather,
assisted in the robbery. See Miller, 83 S.W.3d at 314.

 Appellant also points out the lack of physical evidence, such as video evidence,
fingerprints, or DNA. However, the lack of physical evidence does not render the
evidence supporting appellant's convictions factually insufficient. Harmon v. State,
167 S.W.3d 610, 614 (Tex. App.--Houston [14th Dist.] 2005, pet. ref'd). A rational
jury could have found appellant guilty of aggravated robbery without DNA evidence,
fingerprint evidence, or evidence of the gun or cash from the robbery. Id. (citing
Santos v. State, 116 S.W.3d 447, 459 (Tex. App.--Houston [14th Dist.] 2003, pet.
ref'd).

 In his brief, appellant argues that, "No one could say if the gun used was real
or fake." This contention misrepresents the record. The eyewitnesses testified that
Briscoe brandished a "gun" during the commission of both robberies. Specifically,
Blackmon testified that, on May 12, 2007, Briscoe "had a gun pointed at [her]
forehead" when she was standing "approximately two feet" away. Blackmon testified
she feared for her life, which indicates that she believed the gun to be real. Christian
testified that on June 20, 2007, Briscoe came into the restaurant with a gun drawn and
pointed the gun at her. Christian feared she would be killed. Christian testified that
the weapon was a "revolver" and described it as a "[d]ark gun, short nose, stub barrel,
black handle." Trial counsel never asked Blackmon or Christian (the two employees
at whom Briscoe pointed the gun) if the gun could have been fake. 

 There was no testimony given that the gun was fake. Trial counsel asked
Deborah Farrar, a waitress on May 12, 2007, if she thought the gun was fake. Farrar
testified that she saw the gun and believed it was real. Farrar said that she was
familiar with pistols because her stepfather owned several. Sergeant Nieto testified
that the witnesses reported that a revolver was used. Trial counsel questioned
Sergeant Nieto on the possibility of the revolver being fake, and Sergeant Nieto
responded that he "would think that someone would know a real gun from a fake
gun."

 Testimony from a complainant in close proximity to a weapon, describing it as
a "gun," a "revolver," and a "pistol," is sufficient to prove the use of a deadly
weapon. Wright v. State, 591 S.W.2d 458, 459 (Tex. Crim. App. 1979). It is true that
courts have held that testimony regarding the use of a "gun" may be insufficient to
support a finding of use and exhibition of a deadly weapon when the case presents
separate evidence indicating the use of a toy gun. See Pena Cortez v. State, 732
S.W.2d 713, 715 (Tex. App.--Corpus Christi 1987, no pet.) (holding that testimony
regarding use of "pistol" was insufficient where it was uncontroverted that "pistol"
was toy gun). Here, there was testimony that described the weapon as a "gun" and 
a "revolver," and there was no evidence indicating that it could have been fake or a
toy. Thus, the testimony is sufficient to satisfy the element that a deadly weapon was
used. See Wright, 591 S.W.2d at 459.

 Weighed in a neutral light, the evidence is not so weak that the verdicts are
clearly wrong and unjust. Laster v. State, 275 S.W.3d 512, 518 (Tex. Crim. App.
2009). Also, there is no objective basis in the record to conclude that the great weight
and preponderance of the evidence contradicts the jury's verdicts. Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006). We hold the evidence is factually
sufficient to support appellant's convictions for aggravated robbery.

 We overrule appellant's first issue.

II. Batson Challenge

 In his second issue, appellant contends that the trial court erred by denying his
Batson (2) challenge because the State used four of its eleven peremptory challenges to
strike four of the five blacks from the venire panel. The State argues that appellant
has not shown that the prosecutor's race-neutral explanations were a pretext and,
therefore, that the trial court properly denied appellant's Batson challenge.

A. The Law

 The Equal Protection Clause of the Fourteenth Amendment to the United States
Constitution and Article 35.261 of the Texas Code of Criminal Procedure prohibit the
use of peremptory challenges to exclude veniremembers on the basis of race. See
U.S. Const. amend. XIV, § 1; Tex. Code Crim. Proc. Ann. art. 35.261 (Vernon
2006); Batson v. Kentucky, 476 U.S. 79, 85, 106 S. Ct. 1712, 1716-17 (1986). In the
face of perceived purposeful discrimination, the defendant may request a Batson
hearing to address the challenge. See Tex. Code Crim. Proc. Ann. art. 35.261(a). 

 Trial courts follow a three-step process when resolving Batson challenges.
Snyder v. Louisiana, 552 U.S. 472, ---, 128 S. Ct. 1203, 1207 (2008); Young v. State,
283 S.W.3d 854, 866 (Tex. Crim. App. 2009). First, the defendant must make a
prima facie showing that the State exercised a peremptory challenge on the basis of
race. Snyder, 552 U.S. at ---, 128 S. Ct. at 1207; Young, 283 S.W.3d at 866. 
Second, if the prima facie showing has been made, the burden of production shifts to
the State to articulate a race-neutral reason for its strike. Snyder, 552 U.S. at ---, 128
S. Ct. at 1207; Young, 283 S.W.3d at 866. A reason is deemed race-neutral if no
discriminatory intent is inherent in the explanation given. Purkett v. Elm, 514 U.S.
765, 768, 115 S. Ct. 1769, 1771 (1995). In the third and final step, the trial court
determines whether the defendant has carried his burden to prove purposeful
discrimination. Snyder, 552 U.S. at ---, 128 S. Ct. at 1207; Young, 283 S.W.3d at
866. Throughout the challenge, the burden of persuasion remains with the defendant,
who may continue to rebut the prosecutor's explanations before the trial court decides
the Batson challenge. Moore v. State, 265 S.W.3d 73, 78 (Tex. App.--Houston [1st
Dist.] 2008, no pet.) (citing Purkett, 514 U.S. at 768, 115 S.Ct. at 1771). The
defendant must prove by a preponderance of the evidence that the allegations of
purposeful discrimination were true in fact and that the prosecutor's reasons were
merely a sham or pretext. Watkins v. State, 245 S.W.3d 444, 451-52 (Tex. Crim.
App. 2008).

B. Standard of Review

 "On appeal, a trial court's ruling on the issue of discriminatory intent must be
sustained unless it is clearly erroneous." Snyder, 552 U.S. at ---, 128 S. Ct. at 1207.
To hold that a decision was "clearly erroneous," we must be left with a "definite and
firm conviction that a mistake has been committed." Moore, 265 S.W.3d at 78
(quoting Goldberg v. State, 95 S.W.3d 345, 385 (Tex. App.--Houston [1st Dist.]
2002, pet. ref'd)). Appellate courts must give great deference to credibility and
demeanor determinations made by the trial court in connection with a Batson inquiry. 
Snyder, 552 U.S. at ---, 128 S. Ct. at 1208 (observing that "the best evidence of
discriminatory intent often will be the demeanor of the attorney who exercises the
challenge"). We may not substitute our opinion for the trial court's factual
assessment of the neutrality of the prosecutor's explanation for exercising strikes. 
Gibson v. State, 144 S.W.3d 530, 534 n.5 (Tex. Crim. App. 2004); see Snyder, 552
U.S. at ---, 128 S. Ct. at 1208 (holding "in the absence of exceptional circumstances,"
deference should be given to trial court). We view the evidence in the light most
favorable to the trial court's ruling. Young, 283 S.W.3d at 866. We focus on the
genuineness rather than on the reasonableness of the State's asserted race-neutral
reason. Gibson, 144 S.W.3d at 533-34. In evaluating the genuineness of the State's
proffered race-neutral reasons, we consider "all of the circumstances that bear upon
the issue of racial animosity[.]" Snyder, 552 U.S. at ---, 128 S. Ct. at 1208 (citing
Miller-El v. Dretke, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324 (2005)). 

 When determining whether a race-neutral explanation was a pretext for
purposeful discrimination, we examine whether comparative evidence demonstrates
disparate treatment of minority venirepersons. See Miller-El, 545 U.S. at 241, 125
S. Ct. at 2325. If a prosecutor's race-neutral reason for striking a minority
venireperson applies equally to an otherwise similar non-minority venireperson who
the prosecutor does not challenge, this may be evidence that the race-neutral reason
is a pretext for purposeful discrimination. See id. We cannot, however, automatically
impute disparate treatment in every case in which a reason for striking a minority
venireperson also technically applies to a non-minority venireperson whom the
prosecutor found acceptable. See Cantu v. State, 842 S.W.2d 667, 689 (Tex. Crim.
App. 1992). The decision to strike a particular potential juror is not susceptible to
rigid qualification. Id. As the Court of Criminal Appeals has explained, the decision
to strike a venireperson "is a fluid process, often hinging on the interaction of a
number of variables and permutations" and it "is unlikely that two venirepersons on
one panel will possess the same objectionable attribute or character trait in precisely
the same degree." Id. Such differences, especially in light of a limited number of
available peremptory strikes, may properly cause the State to challenge one potential
juror and not another. See id. Accordingly, we must also look to the entire record to
determine if, despite a similarity, there are any significant differences between the
characteristics and responses of the veniremembers that would, under the facts of this
case, justify the prosecutor treating them differently as potential members of the jury. 
See Miller-El, 545 U.S. at 247, 125 S. Ct. at 2329.

C. Batson Hearing 

 In response to the State's exercise of its strikes, appellant's trial counsel
asserted a Batson challenge, contending that the State struck four veniremembers
because of their race. The record shows that a venire panel of sixty-four people was
summoned for jury selection. Forty-two of these survived challenges for cause. Prior
to the parties' marking of their peremptory strikes, the court announced that the strike
zone ended at veniremember 52, with 53, 56, and 57 to be considered as alternates.
The strike zone consisted of thirty-five veniremembers. Five of those thirty-five
(14.29%) were black. Each side was allowed eleven strikes. The State used four of
its eleven strikes (36.36%) to remove four out of five of the black panel members
available to serve on the jury.

 The trial court took judicial notice, recognizing that appellant and
veniremembers 7, 8, 9, 14, and 31 were black. Of the five black panel members, the
prosecutor struck panel members 7, 9, 14, and 31. Panel member 8 was not struck by
either side and, ultimately, served on the jury. During the Batson hearing, the court
asked the prosecutor to provide his reasons for striking panel members 7, 9, 14 and
31. 

 The prosecutor explained that he struck panel members 7 and 31 because they
were both employed by the United States Postal Service ("USPS"). The prosecutor
explained, "I've specifically had one case that was hung with a United States Postal
Service worker. Also, my experience in talking with witnesses and juries after cases
have been resolved, I've experienced problems in regards to that as an occupation." 
The prosecutor added that panel member 31 originally indicated that she would not
consider assessing a life sentence. The prosecutor stated that he struck panel member
9 because, like panel member 31, he initially indicated that he would not consider a
life sentence. The prosecutor stated that he struck panel member 14 because she
indicated that she had previously visited a loved one in prison on a felony. 

 The trial court found that the State provided race-neutral reasons for its strikes
of panel members 7, 9, 14, and 31 and denied appellant's Batson challenge. On
appeal, appellant argues that the trial court's finding of race-neutral reasons for the
State's strikes was clearly erroneous. (3) 

 At the onset, we note that the State used a statistically disproportionate number
of strikes on black members of the panel. As mentioned above, 14.29% of the panel
within the strike zone were black. However, the State used 36.36% of its strikes on
black panel members. A statistically disproportionate number of the State's strikes
were used against black veniremembers. "The disproportionate use of strikes would
obviously serve to establish a prima facia case," but because the prosecutor provided
a race-neutral explanation, the inquiry whether the defendant has made a prima facie
case is moot. Watkins, 245 S.W.3d at 452; see Moore, 265 S.W.3d at 78. Beyond
establishing a prima facie case, the disproportionality in the use of strikes may also
"support the appellant's ultimate burden of persuasion that the State's proffered race-neutral explanations are a sham." Watkins, 245 S.W.3d at 452. But, as the United
States Supreme Court in Miller-El notes, a comparative analysis is "more powerful"
than "bare statistics," and thus, we consider the reasons offered by the prosecutor to
explain each strike. See Miller-El, 545 U.S. at 241, 125 S. Ct. at 2325. 

 1. Veniremembers Wiggins and Fontenot

 Wiggins (veniremember 7) and Fontenot (veniremember 31) were both black
women employed by the USPS. At the Batson hearing, the prosecutor testified that
he struck Wiggins and Fontenot because of their employment with the USPS. The
prosecutor also stated that veniremember 31 originally indicated that she would not
consider assessing a life sentence. 

 "[W]hen the State indicates that it challenged a prospective juror based on that
person's type of employment and that the State has had poor success with that type
of worker, the reason is a race-neutral explanation for exercising the peremptory
challenge." Moore, 265 S.W.3d at 84 (holding that striking postal worker on basis
of occupation was race-neutral); see Tompkins v. State, 774 S.W.2d 195, 205 (Tex.
Crim. App. 1987), aff'd, 490 U.S. 754 (1989) (also holding strike based on
employment with postal service was race-neutral). A strike based on a persons's type
of employment is deemed to be genuine so long as other people with the same
occupation are also struck. Moore, 265 S.W.3d at 84.

 Here, the prosecutor explained that he struck panel members 7 and 31 because
they were both employed by the USPS. The prosecutor pointed out that panel
members 3 and 42 were non-black panel members also employed by USPS, but those
individuals were removed for cause prior to the exercise of peremptory strikes. Thus,
all persons on the venire employed by USPS were removed, either for cause or by the
prosecutor's use of peremptory strikes. 

 Appellant's trial counsel did not cross-examine the prosecutor on his
explanation but simply responded by arguing that there "is no merit in castigating the
entire United States Postal Service and using that as a weapon to strike anybody that
ever worked for the postal service. It just so happens all these employees were
black." However, the simple fact that the postal employees were black is not
sufficient to satisfy appellant's burden under Batson. See Tompkins, 774 S.W.2d at
205; Young , 283 S.W.3d at 866. Because appellant has pointed to no evidence, such
as disparate treatment of postal workers of different races that would rebut the State's
race-neutral explanation, we will not disturb the trial court's finding that the State's
explanation was sufficient. Accordingly, we cannot conclude that the trial court
clearly erred in accepting the State's race-neutral explanation with respect to the
strike of Wiggins and Fontenot, or that Wiggins and Fontenot were treated disparately
from other panel members.

 2. Veniremember King

 King, veniremember 14, indicated during the prosecutor's questioning that she
had visited a loved one in prison who had been convicted of a felony. The prosecutor
stated that he struck King because of this response, along with all other panel
members who answered similarly. Courts have held that having family or loved ones
arrested, convicted, or in prison is a race-neutral reason for striking a panel member. 
Simpson v. State, 119 S.W.3d 262, 267-68 (Tex. Crim. App. 2003); Earhart v. State,
823 S.W.2d 607 (Tex. Crim. App. 1991).

 The record reflects that four other panel members (numbers 16, 37, 39, and 53)
provided a similar response. The prosecutor successfully challenged panel member
39 for cause and struck panel members 16, 37, and 53. The record shows that the
prosecutor's treatment of veniremembers who had visited loved ones in prison was
uniform. 

 Counsel for appellant offered no response to the prosecutor's stated reason for
striking King. Because the record supports the prosecutor's statement that he
uniformly struck all persons within the strike zone who provided a similar response
to King, we cannot conclude that the trial court clearly erred in denying appellant's
Batson challenge with respect to King or that King was treated disparately. 

 3. Veniremember Robertson

 Robertson, veniremember 9, was a black man who initially indicated that he
could not consider a life sentence for an aggravated robbery. The prosecutor
explained that he struck Robertson for this reason. Unwillingness to consider the full
range of punishment is a race-neutral reason for striking a panel member. Watkins,
245 S.W.3d at 451.

 Appellant's trial counsel responded by arguing that the prosecutor's
explanation was not genuine and was a pretext because he "did not strike [panel
members] 33, 41, 52, and 57, none of which are black and all of which initially said
they could not consider a life sentence." In other words, appellant contends that the
prosecutor treated Robertson differently than other veniremembers who gave similar
initial answers because of his race. Accordingly, we move to a comparative analysis
to determine if the State's race-neutral explanation was merely a pretext. Id.

 a) Comparative Analysis 

 During the State's voir dire examination, the prosecutor explained that the
range of punishment for aggravated robbery was "15 years to life" and asked panel
members if they would be able to consider life imprisonment. The State posed the
question by calling the number of each panel member, allowing each to respond "yes"
or "no." At trial, appellant contended that panel members 33, 41, 52, and 57 provided
a response similar to Robertson's, indicating that they could not consider a
punishment of life imprisonment.

 i) Robertson and Veniremember 57

 Contrary to appellant's argument, the record reflects that, unlike Roberston,
veniremember 57 answered, "Yes," indicating that she could consider a life sentence. 
Thus, appellant was incorrect in asserting that panel member 57 gave a response
similar to Robertson's, and we need not consider panel member 57 in our comparative
analysis.

 ii) Robertson and Veniremember 41

 Similarly, the record reflects that veniremember 41's answer to the prosecutor's 
question was significantly different from Robertson's answer. Unlike Roberston's
categorical answer of "no," veniremember 41's answer was conditioned on the
availability of parole in this case. The record shows the following exchange occurred
when the prosecutor reached panel member 41:

 [Prosecutor]: 41?


 [Veniremember 41]: Can you clarify, with or without parole?


 [Prosecutor]: I can't get into -- the Judge is going to advise you that we can't
talk about that.


 [Veniremember 41]: Then no.


 From this exchange, it can be reasonably inferred that veniremember 41's 
answer hinged on whether the sentence would be life imprisonment with the
possibility of parole. The jury charge did, in fact, include an instruction on parole and
how it was to be considered by the jury in this case. (4) Knowing that a life sentence
here would be imposed with the possibility of parole, the prosecutor could have
reasonably determined that veniremember 41, if selected for the jury, would be able
to consider a life sentence after receiving the instruction regarding consideration of
parole in assessing punishment. Because veniremember 41answered differently from
Robertson, it would also be reasonable that the prosecutor would not find
veniremember 41 objectionable to the same degree as Robertson and choose not to
exercise a peremptory strike on veniremember 41. See Johnson v. State, 959 S.W.2d
284, 292 (Tex. App.--Dallas 1997, pet. ref'd) ("[P]rospective jurors may share a
negative feature, but that feature may be outweighed by characteristics that are
favorable from the State's perspective. Such distinctions may properly cause the
State to challenge one potential juror and not another."); see also Cantu, 842 S.W.2d
at 689 (observing that the decision to strike a particular venireperson "is a fluid
process, often hinging on the interaction of a number of variables and permutations"
and it "is unlikely that two venirepersons on one panel will possess the same
objectionable attribute or character trait in precisely the same degree"). Under these
circumstances we conclude that the prosecutor's failure to strike veniremember 41
does not raise an inference of disparate treatment. Id. 

 iii) Robertson and Veniremember 52

 The record as a whole shows that the responses given by veniremember 52 on
the issue are not sufficiently similar to the response given by Roberston to raise an
inference of disperate treatment. 

 When the prosecutor first posed the question to the panel, the initial responses
of Robertson and veniremember 52 were the same; they both answered "No"
(indicating that they could not assess a life sentence as punishment). However, both
later changed their answer. 

 During the defense's examination, appellant's attorney attempted to rehabilitate
those panel members who indicated they could not consider a life sentence by
describing particularly "gruesome" facts and globally asking by row who "could
never consider a life sentence for an aggravated robbery case, no matter how
gruesome the facts?" Only four panel members (numbers 2, 39, 42, and 48) raised
their hands and indicated that they wished to maintain their previous response and
still would not consider a life sentence. Most of those who, during the State's voir
dire examination, originally indicated that they could not consider a life sentence
were rehabilitated by remaining silent and not affirmatively stating that they wished
to keep their previous response. However, unlike Robertson and the other
veniremembers, the record reflects that veniremember 52 was rehabilitated by raising
her hand and affirmatively stating that she wished to change her answer. The record
reflects the following exchange during the defense's voir dire examination:

 [Defense Counsel]: But you are still sticking to [your previous response] --
your number is?


 [Veniremember 52]: 52


 [Defense Counsel]: You are still sticking to your position?


 [Veniremember 52]: I'm 52, and I'm changing my answer to yes.


 Additionally, the record reflects that panel member 52 was called up to the
bench individually:

 [The Court]: Earlier when they were asking you a question, you said you
couldn't give life in a case. I think that you eventually changed that. Did you
stick to that, or did you change it?

 [Veniremember 52]: I changed it. I can.

 The issue of the ability of a potential juror to assess punishment was an
important issue to both the defense and prosecution. Because the manner in which
veniremember 52 affirmatively changed her initial response was significantly
different from how Robertson was rehabilitated, it would be reasonable that the
prosecutor would not find veniremember 52 objectionable to the same degree as
Robertson. See Cantu, 842 S.W.2d at 689 (observing that veniremembers often
possess negative attributes to varying degrees and such distinctions may properly
cause the State to challenge one juror and not another). In other words, it was not
unreasonable for the prosecutor to conclude that veniremember 52 was more certain
and sincere in her subsequent change of answer than Robertson. Viewing the entire
record as a whole, we cannot conclude that the prosecutor's failure to strike
veniremember 52 raises an inference of Robertson's disparate treatment because of
race and that the prosecutor's explanation for striking Robertson was a pretext.

 iv) Robertson and Veniremember 33

 Finally, we consider veniremember 33. Both veniremember 33 and Robertson
provided the same answer to the prosecutor's question regarding a potential life
sentence and both were passively rehabilitated on this issue by appellant's trial
attorney. However, a review of the entire record supports the conclusion that the 
prosecutor's failure to strike veniremember 33 for the same reason as Robertson was
the result of a mistake in his notes and not evidence of his disparate treatment of
Robertson based on race.

 Here, in response to the challenge by appellant's trial counsel, the prosecutor
represented to the trial court that he exercised a peremptory strike on all
veniremembers who he had marked in his notes as stating that they could not consider
life imprisonment and that he did not strike veniremember 33 because she was not
marked in his notes as having given this response. Appellant's counsel did not cross
examine the prosecutor on this statement or request the production of the prosecutor's
notes to assess the truth of the statement. See Pondexter v. State, 942 S.W.2d 577,
582 (Tex. Crim. App. 1996) (holding that appellant is entitled to prosecutor's voir
dire notes if they were actually used by prosecutor to refresh his memory); Salazar
v. State, 795 S.W.2d 187, 193 (Tex. Crim. App. 1990) (holding that production of a
prosecutor's juror information notes is both "necessary and proper" when prosecutor
refreshes his memory regarding the exercise of peremptory challenges by reviewing
those notes before giving testimony at Batson hearing). Nor has appellant's counsel
presented evidence from the record that would create an inference that the prosecutor
made the mistake in his notes and/or misrepresented to the court the contents of his
notes for the purpose of concealing the alleged disparate treatment of Robertson
because of his race. For example, here, there is no evidence in record that the
prosecutor (1) made statements during voir dire or trial indicating that race played any
factor in his strikes, (2) did not direct any questions to black veniremembers before
attempting to strike them, or (3) attempted a jury shuffle to remove black jurors from
the strike zone. (5) See, e.g., Moore, 265 S.W.3d at 89; see also Miller-El, 545 U.S. at
233, 125 S. Ct at 2320-21 (court considered State's use of jury shuffle to rearrange
panel members when a number of black members were seated at front as indicative
of a broader pattern of discrimination, and ultimately found that State's strikes against
blacks were also racially motivated). (6) Significantly, the prosecutor's conduct in
exercising his peremptory strikes was consistent with his representation to the trial
court that he used his strikes in an attempt to remove all veniremembers who, like
Robertson, initially indicated that they could not consider life. See Watkins, 245
S.W.3d at 453 (holding that, reviewing record in its entirety, prosecutor's race-neutral
reason was not a pretext where State applied this reason to strike black veniremember
and most but not all similarly situated non-black veniremembers) (emphasis added). 
Specifically, of those veniremembers who initially indicated they would not consider
life imprisonment, eight were removed for cause and eight others were methodically
stricken by the State. (7) In sum, reviewing the entire record regarding non-black
veniremembers who, like Robertson, initially responded that they could not give a
life sentence in this case, we find that most were removed for cause or struck by the
State, and those who were not struck have differences far more significant than any
similarity to Robertson. Accordingly, we conclude that the prosecutor's race-neutral
explanation for striking Robertson can be reasonably accepted, and it was not a
pretext. See Miller-El, 545 U.S. at 247, 125 S. Ct. at 2329 (credibility of reasons
given can be measured by "how reasonable, or how improbable, the explanations are;
and by whether the proffered rationale has some basis in accepted trial strategy").

 We cannot conclude that the trial court clearly erred in denying appellant's
Batson challenge to the State's use of peremptory strikes on panel members 7, 9, 14,
and 31. See Moore, 265 S.W.3d at 78 (defining "clearly erroneous" as requiring "a
definite and firm conviction that a mistake has been committed"). Accordingly, we
overrule appellant's second issue.

III. Mother's Testimony

 In his third issue, appellant contends that the trial court erred by refusing to
allow his mother to testify that appellant is "mentally retarded" during the punishment
phase of trial. 

A. The Record

 During the punishment phase, while appellant's mother was on the stand, the
following exchange occurred: 

 [Defense counsel]: And how was he doing in school?

 [Witness]: He wasn't doing well.

 [Defense counsel]: Why not?

 [Witness]: Because [appellant] is mentally retarded, and he got--

 [Prosecutor]: Objection, Your Honor. Hearsay.

 [The Court]: Sustained.

 [Defense counsel]: Can I make a bill on that, Judge?

 [The Court]: Sure.

 The parties approached the bench. At the bench, the following exchange
occurred:

 [The Court]: Mental retardation has a specific definition. It has specific proof. 
Do you have some kind of proof other than this lady's testimony that she
believes her son to be retarded?


 [Defense counsel]: I do but I'm not planning to go into it, and I'm not planning
to ask her if somebody told her. I'm asking her her opinion.


 [The Court]: How would she know?

 [Defense counsel]: I think a parent knows if their child is slow or mentally
retarded.


 [The Court]: Mentally retarded is a legal term. If you can establish that
she--I'm giving you your bill. If you can establish she knows the definition
and she has seen the testing, certainly a parent can testify to that if they know
the required information. The term [sic] "slow" and "mentally retarded" aren't
equal. And then and about the brother--


 [Defense counsel]: I probably would have phrased it as "slow" rather than
"mentally retarded" if I had asked a leading question on that, but she chose the
word "mentally retarded."

 

 [The Court]: That's the reason that I--

 [Defense counsel]: I'm not arguing with your ruling. I will never argue with
your ruling.


 [The Court]: I understand. If you want to follow it up with a question as
opposed to a bill, but if you want to do a bill right now to prove up she can
testify as to mental retardation, that's fine.


 Appellant's counsel then conducted a voir dire examination of appellant's
mother:

 [Defense counsel]: And what would cause you to say [appellant] was mentally
retarded?


 [Witness]: Because he was diagnosed with that when he was in school for
ADHD. And when he was taken into CPS custody, he been [sic] through a lot
of psychiatrists since the age of 7 until the age of 17. And I've got proof and
a package of his medical history of his mental illness. He's slow. He's got
dyslexia.


 [Defense counsel]: Judge, I wasn't planning to offer any of the written
documents. I was just going to offer her impressions, and I wasn't even going
into what all the diagnosis was and who diagnosed and all that kind of stuff. 
Basically from my perspective, I want to prove up from his mother's standpoint
he was slow in school.


 The trial court permitted appellant's mother to testify as follows:

 [Defense counsel]: My question that I'm asking you about now is confined to
when [appellant] was about 7, and I'm asking you your opinion as to his
mental abilities, not a legal opinion and not what somebody else may have told
you, not any records, just what you observed as his mother. How was he doing
mentally at the age of 7?


 [Witness]: [Appellant] wasn't functioning normal like a regular child.

 [Defense counsel]: And what do you mean by that? And I'm talking about
school work.


 [Witness]: He--well, he read [sic] his words--the way he see [sic] his words--
the way we see our words before us, his words is [sic] backwards.


 [Defense counsel]: And how was he doing in school grade-wise?

 [Witness]: He wasn't doing good [sic] at all. He was in special education
classes.


 [Defense counsel]: And how would you characterize, without using legal
words, his mental abilities? Sharp, normal, slow? What would you say?

 

 [Witness]: Slow. 

B. The Law

 Appellant contends on appeal that, under Rule 701 of the Texas Rules of
Evidence, the trial court should have allowed appellant's mother to testify that
appellant is mentally retarded. However, the issue was not properly preserved for
appellate review. See Tex. R. App. P. 33.1.

 Texas Rule of Appellate Procedure 33.1 requires, as a prerequisite to
presenting an issue for appellate review, that the record show that the appellant
brought the issue before the trial court by timely request, objection, or motion, that
stated the grounds with sufficient specificity to make the trial court aware of the
complaint. See id. 

C. Analysis

 Appellant did not explain to the trial court why his mother should have been
allowed to testify that he was mentally retarded under any rule of evidence, let alone
Rule 701. On the contrary, counsel for appellant stated that he was "not arguing with
[the trial court's] ruling" and that the witness, rather than the attorney, "chose the
word 'mentally retarded.'" Counsel for appellant further informed the trial court that
he only wanted to establish "from [appellant's] mother's standpoint" that "[appellant]
was slow in school." The trial court allowed appellant's mother to provide that
testimony.

 Under these circumstances, we conclude that appellant failed to preserve the
issue for appellate review. See Tex. R. App. P. 33.1. We overrule appellant's third
issue.




Conclusion 

 We affirm the judgment of the trial court.


 

 George C. Hanks, Jr.

 Justice


Panel consists of Chief Justice Radack and Justices Alcala and Hanks.

Publish. Tex. R. App. P. 47.2(b).
1. When shown the photo array containing appellant's photo, Blackmon circled appellant's photo and
wrote, "positive both cases."
2. Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).
3. We note that appellant's briefing on the Batson issue is surprisingly general and cursory and
contains misstatements of the record. However, given the important nature of the constitutional
rights involved in this appeal, we construe our briefing rules liberally and will address the full merits
of this issue. See Tex. R. App. P. 38.9.
4. The jury charge in the punishment phase included the following instructions:


 Under the law applicable in this case, the defendant, if sentenced to a term of
imprisonment, may earn time off the period of incarceration imposed through the
award of good conduct time. Prison authorities may award good conduct time to a
prisoner who exhibits good behavior, diligence in carrying out prison work
assignments, and attempts at rehabilitation. If a prisoner engages in misconduct,
prison authorities may also take away all or part of any good conduct time earned by
the prisoner.


 It is also possible that the length of time for which the defendant will be
imprisoned might be reduced by the award of parole.


 Under the law applicable in this case, if the defendant is sentenced to a term
of imprisonment, he will not become eligible for parole until the actual time served
equals one-half of the sentence imposed or thirty years, whichever is less, without
consideration of any good conduct time he may earn. Eligibility for parole does not
guarantee that parole will be granted.


 It cannot accurately be predicted how the parole law and good conduct time
might be applied to this defendant if he is sentenced to a term of imprisonment,
because the application of these laws will depend on decisions made by prison and
parole authorities. 


 You may consider the existence of the parole law and good conduct time. 
However, you are not to consider the extent to which good conduct time may be
awarded to or forfeited by this particular defendant. You are not to consider the
manner in which the parole law may be applied to this particular defendant.
5. In Moore, responding to a Batson challenge, the prosecutor stated that her reason for striking a
black panel member was because she was "an 'older' female with no children" and explained she
wanted jurors with children because they were familiar with the difficulties in dealing with children. 
265 S.W.3d at 87. The prosecutor represented to the trial court that, consistent with her trial strategy,
she also struck a non-black female panel member without children. Id. However, this statement was
not true. The record revealed that the prosecutor did not strike that individual; that panel member
had been struck by appellant. Id. at 88. 

 In reviewing the record as a whole, we found evidence in Moore that would support the
inference that the prosecutor's statement to the court was not a good faith error but rather an attempt
to justify the unlawful disparate treatment of a black veniremember. Specifically, the prosecutor
in Moore explained that her strike "was not just based on . . . skin color," indicating the prosecutor
did not eliminate skin color from her consideration. Id. (emphasis added). We also noted that the
State did not direct any questions to the black panel member, and further questioning of the panelist
might have yielded more information. Id at 89. Under these circumstances we found that the
prosecutor engaged in the unlawful discrimination of black veniremembers because of race. In the
present case, a review of the record does not reveal such similar evidence. 
6. We note that, in this case, four of the five black veniremembers were seated in the first row of the
panel. 
7. The record reveals that veniremembers 2, 10, 11, 32, 38, 39, 42, and 48 were removed for cause,
and the State struck veniremembers 6, 9, 14, 23, 27, 31, 37, and 53.